*This opinion is subject to revision before final publication in the Pacific Reporter*

**2023 UT 22**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

CHRISTOPHER DOUGLAS CENTENO,
*Appellant.*

No. 20200875
Heard February 8, 2023
Filed October 5, 2023

On Direct Appeal

Fourth District, Provo
The Honorable Donald J. Eyre
The Honorable James R. Taylor
No. 181403119

Attorneys:

Sean D. Reyes, Att'y Gen., Jeffrey S. Gray, Asst. Solic. Gen.,
Salt Lake City, for appellee

Herschel Bullen, Salt Lake City, for appellant

JUSTICE POHLMAN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE PETERSEN, and JUSTICE HAGEN joined.

JUSTICE POHLMAN, opinion of the Court:

### INTRODUCTION

¶ 1 While angry and drunk, Christopher Douglas Centeno choked his girlfriend, A.C., to unconsciousness in front of their two-year-old daughter and then raped A.C. twice. A jury convicted Centeno on two counts of rape, one count of aggravated assault, and two counts of domestic violence in the presence of a child. We reject Centeno's multiple claims of error and affirm his convictions.

¶ 2 First, Centeno contends the district court abused its discretion in not withholding from jury deliberations a video exhibit of his police interview. He claims the exhibit should have been withheld from the jury room because it placed undue emphasis on his police interview, violated his constitutional rights, and prejudicially depicted him in handcuffs. We conclude that the district court did not abuse its discretion in rejecting Centeno's undue emphasis objection, and we do not reach his other theories because they are unpreserved.

¶ 3 Second, Centeno asserts he received constitutionally ineffective assistance of counsel. Specifically, he contends defense counsel provided ineffective assistance by not objecting to the admission of the audio and video footage of A.C.'s interactions with law enforcement. And he contends counsel was further ineffective in not keeping a portion of that footage—which was not played in open court—out of the jury room. We reject Centeno's challenge because he has not shown that he was prejudiced by the alleged deficient performance.

¶ 4 Third, Centeno contends the district court erred in denying his motions for a mistrial and a new trial. The State dismissed A.C.'s eight-year-old daughter early in her testimony after she broke down on the witness stand. Centeno argues he did not receive a fair trial because the situation violated his constitutional right to confrontation and left the jury to speculate about the reason for her breakdown. Because Centeno could have called the child to testify after being dismissed by the State, we conclude that the district court did not err in denying his motions.

## BACKGROUND[1]

¶ 5 Christopher Centeno and A.C. began dating in 2015. At the time, A.C. had one daughter (Child). In 2016, A.C. and Centeno had a daughter together (Toddler). Over the course of Centeno and A.C.'s relationship, Centeno lived in A.C.'s apartment on and off.

¶ 6 In the summer of 2018, Centeno and A.C.'s relationship became volatile. Centeno's physical and verbal abuse led to police being called to A.C.'s apartment several times. In October 2018, a series of events resulted in the criminal convictions Centeno challenges on appeal.

---

[1] "On appeal from a jury verdict, we view the evidence and all reasonable inferences in a light most favorable to that verdict and recite the facts accordingly." *State v. Pinder*, 2005 UT 15, ¶ 2, 114 P.3d 551 (cleaned up).

*The Rape and Assault*

¶ 7 One afternoon, A.C., Centeno, and Centeno's cousin (Cousin) gathered at A.C.'s apartment for a meal, planning to watch a boxing match that evening. But things dissolved when Centeno and Cousin began to argue. Cousin thanked A.C. for the meal—to which A.C. thanked him for eating—and left.

¶ 8 Centeno turned his anger toward A.C. for what he perceived as "inappropriate behavior" with Cousin. Centeno viewed A.C.'s "thank you" to Cousin as flirtatious and accused her of wanting to have sex with him. A.C. denied the accusation. She told Centeno that, if anything, she was on the receiving end of things, recounting an incident when Cousin playfully bumped hips with A.C. while maneuvering around the tight quarters of A.C.'s apartment. But A.C.'s denial and explanation were to no avail. Centeno left the apartment to watch the match, and A.C. stayed home, crying and upset.

¶ 9 Later that evening, Centeno returned intoxicated and carrying a bottle of vodka. After a series of arguments, A.C. eventually lay down with Toddler in the bedroom. Centeno followed. He sat on the foot of the bed, "rocking back and forth," "laughing and crying," and telling A.C. he was "so sorry for what's about to happen" and that "you made me do this." Centeno was "acting like he never ha[d] before." He told A.C. that his friends would not respect him if he did not "follow through with getting rid of [her]" and that she was "going to die tonight."

¶ 10 A.C. tried to comfort Toddler, who appeared to be concerned about her dad and wanted to hug him. A.C. explained to Toddler that Centeno was upset over losing his father and grandmother, but A.C.'s words infuriated Centeno. He grabbed A.C. and began hitting her in the head and face. A.C.'s glasses flew off and broke. Centeno then got on top of A.C., pinned her arms under his knees, and choked her. Toddler began yelling and crying for A.C., as did Child, who was in a nearby room. With one hand over A.C.'s nose and mouth and the other on her neck, Centeno choked her until she lost consciousness.

¶ 11 When A.C. came to, Centeno immediately covered her nose and mouth and choked her a second time until she passed out again. This time when A.C. came to, Centeno was no longer on top of her but was sitting against the bed's backboard. A.C. sat up in the bed and noticed she was "soaking wet," having urinated on herself while being choked. She also had "a really hard time breathing," her "chest

hurt," her "ear hurt really bad," her "front bottom teeth felt really loose," and her "lip was really swollen." "[E]verything was stinging."

¶ 12   Centeno then accused A.C. of infidelity. He demanded A.C. give him the phone number of a man he accused her of seeing. She denied the accusation and said she had no phone number to give him. Unsatisfied with her answers, Centeno got on top of A.C. again, hitting her in the head and choking her for a third time. During this attack, Toddler sat beside A.C.'s head, trying to put A.C.'s glasses back on her face. A.C. did not pass out during this third beating, and Centeno eventually stopped.

¶ 13   After the assault ended, A.C. asked Centeno if she could pick Toddler up. Centeno responded by slapping A.C. and then saying, "You can now." Still wet with urine, A.C. lay with Toddler in the bed for about an hour until Toddler fell asleep. At this point, A.C. asked Centeno if she could use the bathroom. Centeno said "yes" and followed her there. While A.C. sat on the toilet, Centeno demanded she perform oral sex on him. A.C. complied while "flinching" through pain.

¶ 14   Midway through the oral sex, Centeno told A.C. to let him have sex with her. Again placating Centeno, A.C. complied but asked him if she could first remove her shirt because it was covered in urine. Centeno said he did not mind the smell and did not let A.C. take off her shirt. A.C. walked over to the mattress on the floor in the living room, and Centeno proceeded to have sex with her. A.C. later described the intercourse as painful, and she "remember[ed] saying [to Centeno] that it was hurting." She testified Centeno "knew that [she] didn't want it to continue because of . . . [her] body language." When the intercourse ended, Centeno told A.C., "I know that you hate it when I fuck you like that."

¶ 15   A.C. got up and went to shower. The water felt painful against her skin. She vomited. After some time, A.C. got out, put some clothes on, spread a blanket over the urine spot on her mattress, and lay next to Toddler. A.C. tried to fall asleep but "felt like [she] was going to die in [her] sleep because [her] head hurt so bad." Centeno slept in bed next to her, holding her phone, which he had taken earlier in the night.

¶ 16   In the morning, A.C. was "in way more pain than [she] was the night before." The sides of her neck hurt, she was swollen beneath her chin, and contact with her skin was painful. She tried to figure out how to leave the apartment. But before she could decide her next move, Centeno told A.C. to let him have sex with her again. A.C. did not want to, but she did not feel like she could say no. When Centeno

compelled A.C. to have intercourse with him, Toddler was lying beside A.C., staring up at her. Crying, A.C. reached down to cover Toddler's eyes. Centeno moved A.C.'s hand and told A.C. that Toddler could watch because she "doesn't know what's happening."

¶ 17   After Centeno was finished, A.C. got up and dressed herself. Centeno placed A.C.'s phone on the bookshelf in the bedroom and told A.C. that she was "not going to call anyone." Centeno then followed A.C. into the kitchen. While Toddler was eating breakfast, Centeno said to Toddler, "Hey, [Toddler], do you want me to kill your mommy? Yes? Or no? Yes? Or no?" Toddler, who was learning to say yes, said yes. Child overheard this and began crying.

¶ 18   After breakfast, Centeno lay on the mattress in the living room and watched television with the children. Noticing Centeno was falling asleep, A.C. retrieved her phone and called her mother (Mother). A.C. told Mother to come quickly and pick her up from her apartment because Centeno "tried to kill [her] last night." Minutes later, Mother arrived. She gave Centeno an excuse as to why she needed to take A.C. and the children for the day, and A.C., the children, and Mother left the apartment and got into Mother's van. Mother drove the van around the corner of the apartment complex, sat in a parking lot, and called the police.

*The Police Interviews*

¶ 19   When law enforcement arrived, an officer (Officer) spoke with A.C. through the open window of Mother's van. Officer noticed bruises on A.C.'s neck. He asked her how long she had been out of the apartment and if she had a way to reach Centeno. A.C. told Officer that Centeno did not have a phone number but that he used a messenger app. Officer asked A.C. if she could try to contact Centeno. A.C. did so and noticed that his phone was "not connecting." She told Officer, "I think he's gone. . . . He doesn't have wifi on his phone. I think he's left."

¶ 20   A.C., Mother, and the children followed the police to the station. When they arrived, A.C. threw up in the parking lot. Inside the police station, Officer sat down with A.C. in an interview room and gathered her personal information. He told A.C., "I appreciate you calling in. I know it takes a lot of strength . . . . We are here for you, okay? . . . Decisions are made but it doesn't make it allowable for him to do anything, okay?"

¶ 21   Officer then asked A.C. to walk him through the incident. A.C. told Officer that she and Centeno got into an argument about Cousin and that Centeno hit her in the head "maybe like 100 times"

and choked her three times. She also explained that her face and neck were swollen and that she had been throwing up. But as A.C. was telling Officer more about the incident, a detective (Detective) entered the room and ended A.C.'s interview with Officer so that A.C. could receive medical care at the hospital.

¶ 22 Around the same time, Centeno arrived in handcuffs at the police station, having been apprehended after an attempted flight from law enforcement. He was taken to an interview room, where Detective removed the handcuffs.

¶ 23 When Detective asked Centeno what happened the night before, Centeno responded, "I really don't remember. I was intoxicated and I was, you know, pretty drunk, man." Detective asked Centeno if he remembered hitting A.C., and Centeno replied, "Like I told you, I don't remember, man." Detective then asked Centeno when he and A.C. last "had consensual sex." Centeno responded, "Consensual sex? . . . What do you mean?" He told Detective they had sex earlier that morning, and he stated, "I hope she's not saying like, I mean, she's my girlfriend, could I be charged with that, like is that a thing like rape?" When Detective told Centeno that "rap[ing] your wife" is a legal possibility, Centeno expressed disbelief, saying, "Geez, man. . . . Crazy, that's crazy."

¶ 24 Soon thereafter, Centeno admitted to Detective that he had assaulted A.C. When Detective told Centeno that A.C. had "marks where [Centeno] strangled her," Centeno replied, "I know but I'm guilty of that, man, but not of the rape, man, not of the rape."

*The Trial*

¶ 25 The State tried Centeno on two counts of rape, two counts of aggravated assault, and two counts of domestic violence in the presence of a child. The jury trial spanned four days in February 2020 and included testimony from A.C., Child, Mother, Officer, the sexual assault nurse examiner who examined A.C. at the hospital (Nurse), Detective, and Centeno.

¶ 26 The State called A.C. first. Struggling to contain her emotions, A.C. testified that on the night in question Centeno hit her "a ton of times" and choked her three times, two of which left her unconscious. As A.C. testified about the choking, she began to feel dizzy, and the prosecution gave her a moment. Once composed, A.C. testified that, after the choking, her brain was "not working" well because her head "was so swollen," her face and lips "were swollen," and her "teeth were hurting." She explained that she went into the bathroom, and Centeno followed her in and told her to perform oral

sex on him. She testified that Centeno then demanded that she have sex with him on the mattress in the living room. She said that she went to sleep after Centeno finished and that Centeno again demanded sex early the next morning. A.C. testified that she complied because "[i]t was not safe to say no."

¶ 27　The State also called eight-year-old Child to testify. When the prosecutor asked Child some preliminary questions, she had difficulty answering. Then, when asked if she "remember[ed] the last night that [Centeno] was in [her] house," Child became emotionally distraught. The State requested a recess, which the court granted. After the recess, the State elected not to resume its examination.

¶ 28　Outside the jury's presence, defense counsel conceded that Centeno "[c]ertainly" did not want the State to resume its examination of Child, but he objected to the "situation" as "unfairly prejudicial" and moved for a mistrial. Specifically, counsel argued that the jury was left to "wild[ly] speculat[e] as to why [Child was] crying." The court denied the motion but invited counsel to propose a curative instruction. After some discussion, and once the jury returned, the court provided the following instruction:

> [G]iven the emotional state of the last witness . . . the prosecution has determined that they're not going to call that witness and since there's no information that is relevant to this case [that] was elicited from that witness, you should not take into consideration the fact that she took the witness stand but now is not going to proceed at all. That should have no relevance with respect to your decisions in this case.

¶ 29　Mother took the stand next. Mother testified that when she arrived at A.C.'s apartment, A.C.'s face was "super red" and "swollen." And Mother testified that after A.C. got out of the apartment, A.C. was "frightened," "crying," and "threw up."

¶ 30　The State also called Officer. Officer testified that he responded to Mother's police call, and the State moved to admit Officer's body camera footage (Exhibit 19). The defense did not object, and the court received Exhibit 19. The State played for the jury the first portion of the recording, which was audio and video footage of Officer talking with A.C. in Mother's van. The State then asked Officer about his preliminary interview with A.C. at the police station. Officer testified that he observed A.C.'s "face was swollen" and that she "had some marks around her neck and some bruises on her face." Officer testified that A.C. reported having been "hit in the face multiple times" and having "vomited several times."

¶ 31   Similarly, Nurse testified that she observed bruises on A.C.'s face and neck. Nurse testified that, during the examination, A.C. disclosed that Centeno "sat on top of her and . . . choked [her]" and that he forced her to have sex with him. And Nurse testified that the injuries on A.C.'s neck were consistent with her report of being choked.

¶ 32   Detective testified that when he arrived at the station, Officer was interviewing A.C. The State then pulled up the second part of Exhibit 19, Officer's body camera footage from the interview room. The State did not play the footage for the jury but instead showed Detective and the jury a still image from the exhibit, which Detective confirmed depicted A.C. in the interview room. Detective testified that he noticed A.C. was "emotionally upset" and "physically injured," with "red marks" and "swelling to her face and neck." And he testified that A.C. "made comments about vomiting."

¶ 33   Detective also testified about his interview with Centeno. At that point, the State moved to admit portions of the audio and video footage from that interview (Exhibit 27). The defense made no objection, and the State played the footage for the jury.

¶ 34   Finally, Detective addressed the State's forensic evidence. On cross-examination, defense counsel asked Detective about blankets and articles of clothing A.C. brought in during a follow-up interview. Although the blankets were "on the bed where the alleged strangulation happened," Detective acknowledged that "no indications of urine were detected" on the blankets. Detective further testified that A.C.'s clothing, though collected, was not tested and that this "may have been an oversight." Detective conceded that it would have been "significant" if testing of the clothing had come back negative because A.C. had "indicated that [her clothing] was essentially soaked . . . with urine."

¶ 35   After the State rested its case-in-chief, Centeno took the stand in his own defense. On direct examination, Centeno admitted that on the night in question he had argued with A.C. and that he was "guilty of domestic violence." He explained that he "put [his] hands on her," "slapped her," and "hit her," though he denied hitting A.C. with "full force" or putting his hands around her neck. As for the accusations of rape, he denied those, too. He testified that the morning after the assault, he talked to A.C., they "kissed and ma[d]e up," they "ha[d] sex," and A.C. "never once" indicated she did not want to do so.

¶ 36   Centeno also testified about his flight from law enforcement. Defense counsel had originally intended to avoid

8

testimony about Centeno's flight, and he had successfully moved to exclude evidence on the issue. But some of Centeno's comments led counsel to believe that the flight evidence was "coming in whether [counsel] want[ed] [it] to or not." So counsel decided to broach the subject first and asked Centeno about it. Centeno testified that when the police arrived at the apartment shortly after A.C. had left, he "freaked out." Centeno stated that he did not open the apartment door, explaining, "I mean, who wants to go to jail? . . . I know that's what's going to happen, you know." Centeno then testified that after ten to fifteen minutes had passed, he opened the door to leave. He initially tried to walk away, but he ran from the police when they shouted at him.

¶ 37 On cross-examination, Centeno walked back his earlier denial of putting his hands on A.C.'s neck, and he admitted to causing the swelling, red marks, and bruising on her face and neck. He also acknowledged that he had choked her, but he claimed that it was a part of "aggressive sex." The State followed up by asking Centeno why he had admitted to Detective that he strangled A.C. Centeno explained that his "first language is not English" and that he "worded it wrong."

¶ 38 During closing arguments, the State, among other things, invited the jury to consider Centeno's admissions and to compare his police interview with his trial testimony. The State argued that the "version of events" Centeno testified to at trial was inconsistent with his statements to Detective. For its part, the defense conceded that the State had provided "clear beyond a reasonable doubt evidence that [Centeno] from the outset has not disputed that he committed assault with substantial bodily injury and domestic violence in the presence of a child times two." Counsel even suggested that the jury "find [Centeno] guilty" of those charges. But counsel insisted that "there are too many holes" in the charges for rape and aggravated assault to find Centeno guilty of them.

¶ 39 The district court sent the jury to deliberate. The trial exhibits, including video footage of Centeno's police interview and of Officer's body camera, went with the jury into deliberations. Shortly afterward, defense counsel objected to "the video footage" going back to the jury room. The defense asserted that having those exhibits go with the jurors "bolster[s] the prosecution's case" and was akin to "get[ting] transcripts of all the testimony that they've heard." The court overruled the objection.

¶ 40 The jury ultimately acquitted Centeno on one count of aggravated assault but convicted him on two counts of domestic

violence in the presence of a child, one count of aggravated assault, and two counts of rape.[2] Centeno later moved the district court for a new trial, arguing in part that he was "completely deprived" of his "ability to confront one of the witnesses against him" because the State discontinued its examination of Child after she became emotional. The court denied Centeno's motion, finding that the defense "made no attempt to call the child as a witness," and concluding that "there was no error, let alone prejudicial error."

¶ 41   Centeno appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 42   Centeno first argues the district court erred in not excluding from the jury's deliberations the exhibit containing footage of his police interview. We review a district court's decision to not withhold a trial exhibit from jury deliberations for an abuse of discretion. *Wyatt v. State*, 2021 UT 32, ¶ 21, 493 P.3d 621.

¶ 43 Second, Centeno contends his trial counsel was constitutionally ineffective for not objecting to the admission of the footage of Officer's interactions with A.C. Also, Centeno contends that counsel was ineffective in allowing the portion of the exhibit that had not been played for the jury to go with the jury into deliberations. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

¶ 44   Third, Centeno argues the district court erred in denying his motions for a mistrial and a new trial. "We review the denial of a motion for a mistrial under an abuse of discretion standard." *State v. Silva*, 2019 UT 36, ¶ 36, 456 P.3d 718. We also generally review a district court's denial of a motion for a new trial for abuse of discretion, but we review any underlying legal conclusions for correctness. *See State v. Pinder*, 2005 UT 15, ¶ 20, 114 P.3d 551.

## ANALYSIS

### I. EXHIBIT 27

¶ 45   After the jury retired to deliberate, Centeno objected to Exhibit 27—the footage of his police interview—going back to the jury room, arguing that allowing the jury to view the exhibit

---

[2] The jury acquitted Centeno of an aggravated assault charge in which the State alleged that he had threatened A.C. with a knife.

"bolster[ed] the prosecution's case" and placed undue emphasis on the interview.[3] The district court overruled the objection.

¶ 46   On appeal, Centeno challenges the court's overruling of his undue emphasis objection, arguing that allowing the jury to review the footage in its deliberations was an abuse of discretion. Centeno also posits two new theories on appeal: first, that the court erred in overruling his objection because allowing the jury to have the exhibit violated his constitutional rights to be present during all critical stages of the proceedings and to confront the witnesses against him; and second, that the court erred in overruling his objection because the video depicted him in handcuffs.

¶ 47   We hold that the district court did not abuse its discretion in overruling Centeno's undue emphasis objection and allowing the jury to take Exhibit 27 into its deliberations. Because Centeno's alternative theories are not preserved, and no exception to the preservation rule applies, we do not reach their merits.

*A. Undue Emphasis Objection*

¶ 48   Centeno contends that the district court erred when, over his objection, it allowed the footage of his police interview to go back with the jury during deliberations. We disagree.

¶ 49   Rule 17(k) of the Utah Rules of Criminal Procedure "occupies the field" regarding the exhibits that juries in criminal cases can take into their deliberations. *Wyatt v. State*, 2021 UT 32, ¶ 21, 493 P.3d 621. The rule states, in relevant part: "Upon retiring for deliberation, the jury may take . . . all exhibits which have been received as evidence, except exhibits that should not, in the opinion of the court, be in the possession of the jury, such as exhibits of unusual size, weapons or contraband." UTAH R. CRIM. P. 17(k).

¶ 50   Thus, as we recently observed in *Wyatt v. State*, the rule "expressly allows the jury to take *all* exhibits back to deliberations except those which the court decides in its discretion the jury should not have." 2021 UT 32, ¶ 19. And a court abuses its discretion only when allowing the exhibit in the jury room would "create a likelihood [of] injustice," such as when the court is motivated by "bias, prejudice, or malice," or "when its decision was against the logic of

---

[3] Centeno's objection was general in nature and appeared to apply to both video exhibits, Exhibit 19 (A.C.'s interactions with Officer) and Exhibit 27 (Centeno's police interview). But because Centeno has challenged the district court's ruling only as it applies to Exhibit 27, we limit our analysis accordingly.

the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *See id.* ¶ 23 (cleaned up).

¶ 51   In exercising its discretion, the court "may consider whether the jury's unfettered access to the exhibit would lead to undue emphasis." *Id.* ¶ 24. But as we noted in *Wyatt*, a defendant's out-of-court statements are "not typically a category that causes concern" under rule 17(k). *Id.* ¶ 26. This is because a defendant's statement impugning his own credibility or incriminating himself carries "little risk" of undue emphasis—instead, statements the defendant has furnished against himself generally "warrant[] whatever emphasis may result." *See id.* ¶¶ 24, 26 (cleaned up).

¶ 52   Here, we conclude that the district court did not abuse its discretion when it overruled Centeno's objection and allowed the jury to take Exhibit 27 into deliberations. By default, rule 17(k) allows Exhibit 27 to go back with the jury.[4] And although the jury's access to the footage of Centeno's police interview may have supported the State's case, any emphasis that the jury placed on Exhibit 27 in deliberations was not unwarranted. In speaking with Detective, Centeno furnished evidence against himself, and the State used that evidence to introduce admissions and show inconsistencies in Centeno's story. As we recognized in *Wyatt*, a defendant's incriminating out-of-court statements generally "warrant[] whatever emphasis" the jury chooses to place on them. *Id.* ¶ 24 (cleaned up). Allowing that evidence to accompany the jury to its deliberations was not so arbitrary and unreasonable as to shock our sense of justice, and thus we affirm.

### B. *Unpreserved Theories*

¶ 53 Centeno alternatively contends the court abused its discretion in allowing the jury to take Exhibit 27 into deliberations because doing so violated his constitutional rights to be present during a critical stage of the proceedings and to confront the witnesses against him. Centeno also complains that he was prejudiced by the video because it showed him in handcuffs. The State contends Centeno has not preserved these theories. We agree with the State.

---

[4] In *Wyatt v. State*, we referred rule 17(k) to our advisory committee on the rules of criminal procedure "for direction on whether the rule itself should include additional guidelines for a district court in determining whether an exhibit should be withheld from the jury." 2021 UT 32, ¶ 24 n.28, 493 P.3d 621. The committee currently has the issue under consideration. We look forward to receiving its report.

¶ 54   Under our preservation rule, any issue brought on appeal "must be sufficiently raised to a level of consciousness before the trial court" such that the court has "an opportunity to rule on" it. *State v. Sanchez*, 2018 UT 31, ¶ 30, 422 P.3d 866 (cleaned up). This requirement promotes judicial economy and fairness. *State v. Larrabee*, 2013 UT 70, ¶ 15, 321 P.3d 1136. And the preservation rule "applies to every claim, including constitutional questions," unless a defendant demonstrates an exception applies. *Id.* (cleaned up).

¶ 55   Centeno contends his objection was "broad enough to preserve" the confrontation and prejudice theories he now presents on appeal. But for purposes of preservation, "we view issues narrowly," *State v. Johnson*, 2017 UT 76, ¶ 14 n.2, 416 P.3d 443 (cleaned up), and require a party to raise an issue before the district court with specificity, *id.* ¶ 15. Moreover, where "a party makes an objection at trial based on one ground, [that] objection does not preserve for appeal any alternative grounds for objection." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867. Here, Centeno's objection on grounds of undue emphasis did not raise before the district court the issues that he now asserts on appeal: that his rights to be present and to confront adverse witnesses were violated, and that the video unfairly depicted him in handcuffs. Accordingly, he did not preserve these theories. *See Sanchez*, 2018 UT 31, ¶ 30; *Low*, 2008 UT 58, ¶ 17.

¶ 56   Centeno alternatively asserts that, to the extent we deem these theories unpreserved, we should consider them under the exceptional circumstances exception to the preservation rule.

¶ 57   It is well established that we will not address the merits of an unpreserved issue absent a showing that an exception to the preservation rule applies. *See, e.g.*, *Johnson*, 2017 UT 76, ¶ 15. The exceptional circumstances doctrine is one of those exceptions, *State v. Flora*, 2020 UT 2, ¶ 9, 459 P.3d 975, but it "is applied sparingly" and reserved "for the most unusual circumstances," *Johnson*, 2017 UT 76, ¶ 29 (cleaned up). To invoke the doctrine, a party must make a showing of "a rare procedural anomaly," *id.* ¶ 31, and only then will the court "consider the effects of the anomaly, and whether those effects warrant an exception to our preservation requirement," *id.* ¶ 37. In analyzing these effects, we may consider, among other things, whether "manifest injustice" would result from not reaching the merits of the issue and whether "a significant constitutional right or liberty interest is at stake." *Id.* (cleaned up).

¶ 58   Centeno argues, for the first time in his reply brief, that exceptional circumstances exist because "it is asking a great deal of defense counsel to come up with a fully briefed articulation of the

basis of his objection . . . under the pressure of the trial proceedings." We reject this argument for two reasons. First, it is untimely. We typically do not address issues raised for the first time in a reply brief. *Id.* ¶ 16. Second, we do not see it as a "rare procedural anomaly" to require a trial attorney to identify the legal basis for an objection—even under the pressure of trial. *See id.* ¶ 29. Were it otherwise, the exception would swallow the rule.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 59 At trial, the State called Officer to testify and, on direct examination, introduced Officer's body camera footage as Exhibit 19. The exhibit contained two relevant parts: A.C. in Mother's van talking with Officer and A.C.'s interview with Officer at the police station.[5]

¶ 60 In the first part, A.C. is speaking with Officer through an open car window shortly after Mother helped her leave the apartment. During the two-minute exchange, Officer asks A.C. if she has a way to contact Centeno. Unable to reach him on a messenger app, A.C. tells Officer that she thinks Centeno has "left" and is "gone" from the apartment.

¶ 61 The second part of Exhibit 19 captures A.C.'s seventeen-minute interview with Officer at the police station. The video begins with Officer taking down A.C.'s personal information and telling A.C. that he appreciates her calling and that he knows "it takes a lot of strength." Officer then asks A.C. to walk him through the incident. She tells Officer that she and Centeno argued the night before and that he hit her in the head "maybe like 100 times" and choked her three times. She also explains that her face and neck are swollen and that she has been throwing up. Before A.C. has a chance to tell the rest of her story, Detective enters the room and interrupts the interview to ask A.C. to go to the hospital to receive medical care.

¶ 62 When the State moved to admit Exhibit 19, defense counsel made no objection. The State played the first part of the video—the van footage—for the jury. The second part—the station footage—was not played; only a still shot of A.C. in the interview room was shown. When the jury retired for deliberations, the district court sent the trial exhibits, including Exhibit 19, with the jury.

---

[5] Exhibit 19 also contained a third part, showing Officer and other law enforcement personnel walking through A.C.'s apartment. This footage has no audio and was played for the jury in open court. As Centeno concedes, part three "reveals nothing material to the discussion in this appeal" and so we need not discuss it further.

¶ 63 Centeno contends that defense counsel rendered constitutionally ineffective assistance in two ways relating to Exhibit 19. First, Centeno argues that counsel provided ineffective assistance by not objecting to the exhibit's admission on the ground that it was inadmissible hearsay. Second, Centeno argues that counsel was ineffective in not objecting to the jury taking the station footage into deliberations because that segment of the video was not played in open court.[6]

¶ 64 "To prove ineffective assistance of counsel, the defendant must establish two things: first, that trial counsel performed deficiently and second, that trial counsel's deficient performance prejudiced the defendant." *State v. Bonds*, 2023 UT 1, ¶ 35, 524 P.3d 581 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We are free to reject a defendant's claim under either prong of the *Strickland* test because "failure to establish either prong . . . is fatal to an ineffective assistance of counsel claim." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. And the U.S. Supreme Court has instructed that where "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. Because we conclude that Centeno's defense was not prejudiced by counsel's alleged deficient performance, we limit our analysis to the second prong.

¶ 65 When evaluating prejudice in the context of ineffective assistance, we "consider the totality of the evidence" before the jury and "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different" absent counsel's alleged error. *Id.* at 695–96. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* at 694.

¶ 66 We conclude that Centeno cannot demonstrate ineffective assistance of counsel because he has not shown that the jury's verdict "would reasonably likely have been different" had either part of Exhibit 19 been excluded from evidence or the jury room. *See id.* at 696.

*A. Exhibit 19: The Van Footage*

¶ 67 Centeno contends that the footage of A.C. in the van was prejudicial because her statement to Officer that Centeno was not in

---

[6] Centeno has not argued that his counsel was ineffective for not objecting to the *admission* of the station segment on the basis that it was not played for the jury.

the apartment was not "indic[ative] of innocence" and cast doubt on his credibility. We are unpersuaded for several reasons.

¶ 68   First, the evidence was of minimal probative value. Officer asked A.C. if Centeno was still in the apartment and if A.C. could reach him. When it appeared that Centeno's phone was not connecting to the messenger app, A.C. assumed it meant he had left the apartment. Before that, Mother had told Centeno that she needed to take A.C. and the children for the day without any suggestion that A.C. was going to report Centeno to the police. Thus, we doubt the jury would view A.C.'s belief that Centeno had left the apartment as suggestive of guilt.

¶ 69   Second, Centeno's own admission of flight overshadowed any negative inference that the jury could have drawn from A.C.'s statement to Officer. Centeno testified that, contrary to A.C.'s assumption, he had not left the apartment before police arrived. Centeno explained that when the police showed up at the apartment door, he would not open it, stating, "I mean, who wants to go to jail? . . . I know that's what's going to happen, you know." Centeno also testified that when he finally left the apartment ten to fifteen minutes later, he ran from police when they shouted at him. Given this testimony, the jury had no need to infer from A.C.'s statement that Centeno had fled due to a guilty conscience. Centeno admitted as much himself.

¶ 70 Third, and perhaps most importantly, the State's case against Centeno was overwhelming. A.C. offered compelling testimony of Centeno's rape and assault, testimony that was corroborated by photographs and several other witnesses who testified to her overall condition and injuries the morning after. Further, Centeno corroborated her account of the couple's arguments, and he admitted—either in the police interview, at trial, or both—that he hit and strangled A.C. Although Centeno denied raping A.C. and choking her unconscious, his denials rang hollow given his initial assertions to Detective that he was intoxicated and could not remember what had happened the night before, his reaction when Detective told him it was legally possible to rape your wife, and his other inculpatory admissions. In other words, the jury did not need to infer guilt based on A.C.'s innocuous statement that she believed Centeno had left the apartment. Rather, the jury undoubtedly relied on Centeno's own admissions and other corroborative evidence of his guilt, leaving us no reason to believe that the verdict would have been different had the jury not heard A.C. tell Officer that Centeno had left the apartment. *See Strickland*, 466 U.S. at 696 (explaining that a verdict

"only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). Thus, Centeno's claim of ineffective assistance of counsel based on Exhibit 19's van footage is unavailing.

*B. Exhibit 19: The Station Footage*

¶ 71   Centeno contends that the footage of A.C.'s interview at the police station was unfairly prejudicial because it showed Officer lending support to A.C. and showed A.C. "overwrought" with emotion. Centeno also argues that because the interview footage was not played for the jury in open court, he was deprived of the ability to explain or comment on it. Centeno argues that, had the jury not seen this footage, it is reasonably likely that the jury's verdict would have been different.[7] Again, for several reasons, we disagree.

¶ 72   First, to the extent the footage showed Officer expressing support to A.C., we disagree with Centeno's assertion that it was "gratuitous." A.C. arrived at the police station with visible injuries on her face and neck. Officer could see that she had been injured—a fact not in dispute—and thus he understandably tried to make her feel comfortable as she made her report. The jury would have understood that Officer's comments about it taking strength to call the police was not a comment on the veracity of A.C.'s specific accusations, particularly where the interview had only just begun.

¶ 73   Second, we do not share Centeno's view that the jury was swayed against him by seeing A.C. as "overwrought" and "anguished" in the footage. During the interview, A.C. appears remarkably controlled. Although she occasionally cried, she was focused and responsive to Officer's questions, and she described events without losing her composure. Further, the jury already saw A.C. testify emotionally at trial, with the prosecutor twice asking her if she needed a break. Because the jury personally witnessed an equally, if not more, emotional A.C. at trial, we cannot agree that a reasonable probability exists that the jury's verdict would have been different had Exhibit 19's station footage been excluded.

¶ 74   Centeno next contends he was uniquely prejudiced by the fact that the station footage was given to the jury despite it not having been played in open court. Specifically, he asserts this prejudiced him because he "had no opportunity to 'explain or even comment [upon]' footage played only during deliberations." (Quoting *State v. Midgett*,

---

[7] Centeno assumes the jury watched the station footage during its deliberations. For purposes of our analysis, we do the same.

680 N.W.2d 288, 293 (S.D. 2004).)[8] But in making that assertion, Centeno does not identify a single comment or explanation he would have made if the footage had been played during trial. That is not surprising. After all, A.C.'s interview statements—assuming the jury watched the footage—would not have been news to the jury.

¶ 75 If the jury had watched the video, it would have heard A.C. tersely tell Officer that Centeno hit her repeatedly and choked her three times, that her face and neck were swollen, and that she had been throwing up. But A.C. testified to the same at trial, and in much greater and more graphic detail. Further, Centeno generally did not dispute A.C.'s police station assertions. To the extent Centeno tried to explain, he did so by testifying that the choking was part of "aggressive sex" and that A.C.'s injuries were incurred in a mutual fight she provoked, and by emphasizing testimony that A.C.'s bruises could be the result of vomiting as opposed to strangulation. Thus, not only was the station footage cumulative of the more vivid testimonial evidence, but Centeno has not shown there were any assertions in the unplayed footage that he did not confront.

¶ 76 Finally, in making his prejudice argument, Centeno has not shown that the station footage "added enough to the overall evidentiary picture already before the jury to impact the outcome of the [trial]." *See State v. Scott*, 2020 UT 13, ¶ 45, 462 P.3d 350. As we have already observed, the evidence against Centeno was compelling. Centeno admitted—in his interview played for the jury and during his trial testimony—that he was guilty of assaulting A.C. and was responsible for her injuries. *See supra* ¶¶ 24, 33, 35, 37. Further, Centeno's admissions were corroborated by the testimony of A.C., Mother, Officer, Detective, and Nurse, as well as by photographs of A.C.'s injuries. A.C. testified in compelling detail about the abuse she suffered at the hands of Centeno, and A.C. did

---

[8] Centeno's reliance on *Midgett* is inapposite, as that case is neither controlling on this court nor persuasive under the circumstances. *See generally State v. Midgett*, 680 N.W.2d 288 (S.D. 2004). In *Midgett*, the appellate court analyzed whether the trial court "erred in allowing the jury, during its deliberations, to view a videotaped interview of [the defendant] that was neither played during trial *nor admitted into evidence*." *Id.* at 290 (emphasis added). The appellate court determined that "[a]llowing the jury to consider . . . *non-admitted* evidence was prejudicial error that require[d] reversal." *Id.* at 293 (emphasis added). That holding is unpersuasive here both because Exhibit 19 was admitted into evidence and because Centeno's argument comes to us in an ineffective assistance posture.

not have the same credibility challenges Centeno did. Centeno had admitted to fleeing from police, he suddenly remembered details of the night in question after originally telling Detective he could not recall what had happened, his police interview and his trial testimony lacked consistency, and his claims of consensual sex and choking were difficult to square with A.C.'s injuries and his admissions of assault. In sum, given the overwhelming evidence against Centeno, no reasonable probability exists that, absent admission of Exhibit 19's footage of A.C.'s station interview, the jury "would have had a reasonable doubt respecting guilt." *See Strickland*, 466 U.S. at 695. Accordingly, Centeno's ineffective assistance claim based on the station footage of Exhibit 19 is also unavailing.[9]

### III. MISTRIAL AND NEW TRIAL MOTIONS

¶ 77 Centeno challenges the district court's decisions denying his motions for a mistrial and a new trial. First, Centeno contends the district court abused its discretion when it denied his mistrial motion, arguing that Child's "non-verbal breakdown" left the jurors "to speculate as to" the reason for the breakdown, which Centeno claims "could only be interpreted against him." Second, Centeno contends that the district court erred when it denied his motion for a new trial because, in Centeno's view, his rights under the Confrontation Clause of the Sixth Amendment were violated. Specifically, Centeno claims

---

[9] Relatedly, Centeno asserts that "the jury's possessing in deliberations evidence not played in open court" is "reversible structural error." For that proposition, Centeno cites *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996), *amended by* 140 F.3d 1244 (9th Cir. 1998) (mem.). In *Noushfar*, the Ninth Circuit Court of Appeals determined that "[s]ending unplayed tapes to the jury room" is "a structural error requiring automatic reversal." *Id.* at 1445. But *Noushfar* is not binding on this court. And regardless, it is inapposite. *Noushfar* involved a preserved error, not an ineffective assistance of counsel claim. *See id.* at 1444. Although structural error analysis generally presumes prejudice, *see State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543, a showing of prejudice is still required when structural error is asserted through the framework of ineffective assistance, *see Weaver v. Massachusetts*, 582 U.S. 286, 300–03 (2017); *see also State v. Garcia*, 2017 UT 53, ¶ 36, 424 P.3d 171 ("[A]lthough a violation of the defendant's right to a public trial is a structural error, where the unpreserved issue was raised as ineffective assistance of counsel, *Strickland* prejudice is not shown automatically."). Centeno has not met his "burden to show that he was prejudiced by his counsel's performance." *See Garcia*, 2017 UT 53, ¶ 37; *see also supra* ¶¶ 71–76.

he was deprived of the opportunity to cross-examine Child when the State elected not to resume its examination of her. Because Centeno has not shown error, both arguments fall short.

### A. The Mistrial Motion

¶ 78 At trial, the State called eight-year-old Child to testify. When she was asked if she remembered the last night Centeno was at her apartment, Child became emotionally distraught. The court then granted the State's request for a recess to allow Child to compose herself. However, during the recess, the State decided not to resume the examination and the defense chose not to cross-examine her. Outside the jury's presence, the defense conceded that it "[c]ertainly" did not want the State to resume its examination, but it still objected to the "situation" as "unfairly prejudicial" and moved for a mistrial. Specifically, the defense argued that the jury was left to "wild[ly] speculat[e]" about the reason for her breakdown. The court denied the motion and, upon the jury's return, instructed it to disregard the fact that Child took the witness stand but would not return to testify. *See supra* ¶ 28.

¶ 79 The district court "has broad discretion in determining whether a mistrial should be declared." *State v. Workman*, 635 P.2d 49, 53 (Utah 1981). A court may grant a mistrial "where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary in order to avoid injustice." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948 (cleaned up).

¶ 80 But "the prerogative of a reviewing court is much more limited." *Id.* "Because a district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings," we will not reverse the court's denial of a mistrial motion "unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (cleaned up); *see also State v. Butterfield*, 2001 UT 59, ¶ 47, 27 P.3d 1133 (explaining that an appellant challenging the denial of a mistrial must show unfair prejudice, such that "the verdict was substantially influenced by the challenged testimony" (cleaned up)).

¶ 81 We have no basis to reverse the district court's denial of Centeno's mistrial motion. He has not shown that Child's breakdown on the witness stand "so likely influenced the jury that [he] cannot be said to have had a fair trial." *See Allen*, 2005 UT 11, ¶ 39 (cleaned up). Not only was the jury instructed not to draw any inference from the fact that the prosecution elected not to proceed with its examination of Child given her "emotional state," the reason for her reaction was

not apparent. Child, who was only eight years old, might have been afraid of testifying in a courtroom. After all, she struggled to answer even the State's preliminary questions. Or, Child might have reacted emotionally because she missed Centeno or because she was uncomfortable recalling the events of the night in question. But regardless of the reason, it was a passing moment in a four-day trial, and little could be drawn from it. And, if Centeno was concerned about the jury speculating as to the reason for the breakdown, he could have called Child back to the stand for cross-examination. He chose, however, not to do so. Thus, any possible influence Child's reaction could have had on the jury was not unfair. Accordingly, we affirm the court's denial of Centeno's mistrial motion.

### B. The New Trial Motion

¶ 82   After the jury returned its verdict, the defense again raised the issue of Child's emotional breakdown on the witness stand, this time moving for a new trial under rule 24(a) of the Utah Rules of Criminal Procedure. Centeno argued that a new trial was warranted because he was "completely deprived of the ability to confront one of the witnesses against him." The court denied the motion, reasoning that Centeno "made no attempt to call the child as a witness."

¶ 83   A district court may grant a new trial "in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." UTAH R. CRIM. P. 24(a). Centeno's claim for a new trial fails because the premise for his claim—an alleged violation of his Sixth Amendment right to confrontation—is flawed.

¶ 84   "The Sixth Amendment of the United States Constitution, which applies to both federal and state criminal prosecutions, grants the accused the right to be confronted with the witnesses against him." *State v. Timmerman*, 2009 UT 58, ¶ 9, 218 P.3d 590 (cleaned up). That right to confrontation guarantees a defendant the *opportunity* to cross-examine a witness but it does not guarantee that the opportunity be *exercised*. *State v. Pecht*, 2002 UT 41, ¶ 39, 48 P.3d 931. In other words, the confrontation clause is not violated simply because a defendant elects not to question a witness who appears for cross-examination at trial. *See id.*

¶ 85   Although the State elected not to resume its examination after Child became emotionally distraught, Centeno had every opportunity to call Child back to the stand for cross-examination and elected not to. Under these circumstances, Centeno's confrontation

rights were not infringed. Thus, the district court correctly denied Centeno's motion for a new trial on this ground.[10]

## CONCLUSION

¶ 86 We conclude the district court did not err in overruling Centeno's undue emphasis objection and sending Exhibit 27—his police interview footage—back with the jury. Because Centeno did not preserve his additional theories challenging Exhibit 27, we do not address them. As for Centeno's challenge based on ineffective assistance of counsel arising out of the admission of Exhibit 19—the footage of A.C.'s interactions with Officer—it fails for lack of prejudice. Finally, we conclude the district court did not err in denying Centeno's motions for a mistrial and a new trial arising out of Child's breakdown on the witness stand. Accordingly, we affirm Centeno's convictions.

---

[10] Centeno also invokes the cumulative error doctrine, asserting that the alleged errors, when "considered together," require reversal. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7 (cleaned up). "But if the claims are found on appeal to not constitute error, . . . the doctrine will not be applied." *State v. Maestas*, 2012 UT 46, ¶ 363, 299 P.3d 892 (cleaned up). Because Centeno has not shown any errors to cumulate, the doctrine is inapplicable.