**2023 UT App 145**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STACEY AUSTIN JOHNSON,
Appellant.

Opinion
No. 20210838-CA
Filed November 24, 2023

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 171905182

Stacey Austin Johnson, Appellant Pro Se

Sean D. Reyes and Marian Decker,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1      Stacey Austin Johnson convinced would-be borrowers to deposit millions of dollars into his accounts—including his attorney trust account—to secure large business loans that never funded. After Johnson's license to practice law was suspended, he failed to inform borrowers of this and continued to receive funds into his attorney trust account. Some borrowers maintained that they relied on Johnson's representation that their money would remain in Johnson's attorney trust account until their loans funded—a representation that was a complete untruth as their money was immediately forwarded to the purported lender.

¶2      Johnson was convicted on five counts of communications fraud and one count of pattern of unlawful activity. Johnson now

argues (1) that the jury instructions constructively amended his charges, (2) that the jury instructions incorporated the wrong mens rea, (3) that a jury instruction related to the timing of effectiveness of orders was incorrect, (4) that his convictions were not supported by substantial evidence, and (5) that the district court abused its discretion by ordering excessive restitution. We find each of Johnson's contentions unavailing, and we affirm his convictions and the court's restitution order.

BACKGROUND[1]

¶3 In early 2015, the Fourth Judicial District Court of Utah held an adjudication trial in which the Utah State Bar's Office of Professional Conduct argued that Johnson had committed unprofessional conduct as an attorney. The court entered an order on June 15, 2015, prohibiting Johnson from "practicing law in the State of Utah" and from "holding himself out as an attorney at law." The order specified that Johnson's suspension was "effective as of 30 days from the date" the order was entered. On August 10, 2015, Johnson filed a motion to dismiss and an application to stay his suspension pending an appeal. The court denied Johnson's application and motion on September 9, 2015.

¶4 Meanwhile, Johnson was engaged in a course of action that would lead to the charges at issue in the present case: arranging to assist borrowers in obtaining multi-million-dollar business loans from a purported overseas lender (Lender). In his principal brief, Johnson explained that "Lender required borrowers to pay 1% of the amount of any loan up front so it could buy insurance for the benefit of ¶ Lender against default" and that "in November 2014" Johnson "agreed to work for Lender as an attorney to

---

1. "We recite the facts in the light most favorable to the jury's verdict, and we present conflicting evidence as necessary to understand issues raised on appeal." *State v. Black*, 2015 UT App 30, ¶ 2, 344 P.3d 644.

receive this 1% payment in his attorney trust account and forward all of it to Lender." This account was an Interest on Lawyers' Trust Accounts (IOLTA) account, a particular type of trust account available to attorneys for responsibly holding client funds.[2] Johnson further stated that "Lender required [Johnson] to have malpractice [insurance] on his [a]ttorney trust account so Lender could trust [Johnson] to receive money from borrowers and send it as directed." He claimed that "for his help, [he] would receive 1% of the funded loans," which 1% "would be funded at the same time . . . Lender funded any other loan."

¶5    The FBI investigated Johnson's activities. This investigation included sending an agent (Agent 1) to meet with Johnson as a representative of a supposed prospective borrower in December 2016. Agent 1's surreptitious recording of the exchange, later played at trial, illustrates Johnson's role in the scheme. Agent 1 met with Johnson at Johnson's law office, where Johnson explained "the loan program." He told Agent 1 that the primaries were a "group of Middle Eastern sheiks" holding "investment grade instruments" that they "take . . . to a central bank and the central bank can use . . . as its money supply." He stated that they had a one-billion-dollar instrument that could be "multipl[ied] by 16 times." Johnson directed Agent 1 to have his clients deposit $500,000 into Johnson's attorney trust account to

---

2. "Law firms need to follow very specific rules on how client funds are handled, and maintaining an IOLTA account ensures you are compliant with ethical and legal obligations." Kate Rattray, *What Is an IOLTA Account? A Complete Guide*, Clio (Nov. 8, 2023), https://www.clio.com/blog/iolta-account/ [https://perma .cc/3578-4Q5W]. "The income generated on the pooled funds" from IOLTA accounts "is used for civil legal aid and other programs that support access to justice for low-income people." *IOLTA Basics*, National Association of IOLTA Programs, https://iolta.org/what-is-iolta/iolta-basics/ [https://perma.cc/EH8 S-7LYJ].

receive a $50 million loan. He said that once Lender "got the money in [its] account," it would "send out . . . a wire transfer for the payment for the premium." He further said, "And then if all else is in place, within 48 hours we've got the money to issue." Johnson informed Agent 1 that there would be a $10,000 processing fee for the loan.

¶6 Johnson accepted money from multiple borrowers into his accounts (his IOLTA account and another account) between November 2014 and August 2016 totaling approximately $2.9 million.[3] After Johnson's license to practice law was suspended, he did not inform various borrowers of that fact but continued accepting their money into his IOLTA account.

¶7 Johnson repeatedly asked borrowers to deposit more money to pay fees and to satisfy the minimum amount that would release the loan funds. Still, the loans did not fund as promised. One of the borrowers contacted law enforcement and made a complaint alleging that he had been defrauded, thereby prompting the above-described investigation. Johnson was eventually charged in the Third Judicial District Court of Utah with six counts of communications fraud and one count of pattern of unlawful activity. The charges of communications fraud were each associated with different alleged victims. Each count of communications fraud alleged:

---

3. Johnson asserts that roughly $2.8 million of that amount was intended to be sent to Lender and that Johnson sent that entire amount to Lender, while approximately $100,000 was an amount "borrowers . . . agreed to pay him separately for helping them apply for their loans," which money he kept. But he claims that "[n]one of the victims" his charges are based on "ever paid any money to [him] because he agreed to collect from them when their loans funded."

[Johnson] devised a scheme or artifice to defraud another . . . or to obtain from another . . . money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and did communicate directly or indirectly with any person by any means for the purpose of executing or concealing the scheme or artifice, and the value of the property, or thing obtained or sought to be obtained exceeds $5,000.

¶8   The district court presided over a jury trial on the charges in September 2021. The jury heard testimony from the alleged victims associated with each of the communications fraud charges, as well as from additional alleged victims and FBI agents (Agent 2, Agent 3, and Agent 4). The victims testified to the facts as described above, including that Johnson did not inform them that his license to practice law had been suspended. Several victims also testified that Johnson told them their money would be secure in his attorney trust account and that if the loans did not fund, their deposits would be refunded to them.

¶9   Agent 3 recounted an interview he and Agent 2 conducted with Johnson wherein they told him they were investigating Lender and he agreed to speak with them. A recording of this interview was played for the jury. During the interview, Agent 2 asked if Johnson had a law degree, and Johnson said yes but claimed that he stopped practicing law in June 2015 because his license was suspended following a bar complaint. Agent 2 noted that Johnson had his "name on the front of the [office] doors as . . . an attorney," and Johnson said that he "just [had not] taken that down" but had stopped practicing in June 2015. He explained that he had an attorney trust account while he practiced law but maintained that "when [he] stopped practicing, [he] just had a regular bank account." Agent 2 asked if any money went into his attorney trust account after he stopped practicing, and he responded, "Yeah . . . probably—like, the first month, you know."

At trial, Agent 3 testified that he had reviewed Johnson's bank records and found twelve deposits into Johnson's attorney trust account "from the time that Mr. Johnson's law license was suspended on July 15, [2015,]" "until November 16, 2015."

¶10 Johnson's defense counsel (Counsel) cross-examined Agent 3 regarding the date he had given for Johnson's suspension. Agent 3 indicated that he did not "make an independent inquiry with the state bar as to when [Johnson's] . . . bar license suspension went into effect" and that he also was not aware if his partner, Agent 2, had made such an inquiry. Counsel provided Agent 3 with a copy of "a report from [Agent 2] dated January 12, 2017," and from it, Agent 3 read, "[The] deputy senior counsel at [the] Utah State Bar advised that on or around June 15, 2015, the Utah law license of . . . Johnson was suspended. Johnson's license was suspended for two years and took effect on October 16, 2015." Agent 3 then said, "So it appears that I was incorrect."

¶11 After this, the State sought and obtained admission of several documents, including the Fourth Judicial District Court's (1) order from March 2015 setting Johnson's disciplinary matter for a sanctions hearing; (2) order from June 15, 2015, directing that Johnson "be suspended for two years effective as of 30 days from the date of this Order"; and (3) ruling on September 9, 2015, denying Johnson's motion to stay his suspension pending appeal.

¶12 Agent 4, a forensic accountant, testified that he had reviewed "bank statements, deposits, checks, [and] wires" related to the case. He testified about what he found and about the various exhibits he had prepared for the State, which were admitted at trial. Several of these exhibits showed deposits alleged victims had made into Johnson's attorney trust account after July 15, 2015.

¶13 After the State rested, Counsel moved for a directed verdict. Counsel argued that count one should be dismissed because there was "no nexus" between Johnson and the alleged

victim identified in that count. Counsel asserted (1) that the relevant exhibits showed that the wiring instruction, though from Johnson, indicated that the money would be sent directly to Lender and (2) that the related promissory note and loan agreement did not involve Johnson. However, Counsel stated that as to "[t]he other counts, [he] would submit . . . that there's substantial evidence that the case should proceed to the jury." The State responded that as to count one, the alleged victim "talked about Mr. Johnson being the gatekeeper here[] and that the funds were going to go into his trust account" and said he "was supposed to hold the funds in escrow until this big $5 million loan funded." The State continued, "And, again, . . . there's oral testimony about [Lender] and the representations made, and so I think there is sufficient evidence for the count to proceed to the jury." When the court asked Counsel for rebuttal, he said, "I'll submit it, Your Honor." The court then denied the motion for directed verdict on count one, saying it found "that there's been sufficient evidence . . . to establish a prima facie case on that count," including the testimony of the victim associated with the count and Agent 4's testimony, which the court said allowed it to "pretty readily and easily" identify a nexus.

¶14    Johnson then presented his defense. He testified on his own behalf, and he also called as witnesses his wife and an accountant. On appeal, Johnson has not provided a transcript of his or his wife's testimonies. He did not renew his motion for a directed verdict after presenting his case.

¶15    After this, the court asked Counsel and the prosecutor if they "had a chance to go over the draft of the instructions," and both answered affirmatively. The court then discussed the jury instructions with the attorneys. First, the court addressed the instructions on the elements for each count of communications fraud. These instructions left out the language from the Information that Johnson allegedly devised a scheme or artifice "to defraud another," instead containing only the alternative

language that Johnson allegedly devised a scheme or artifice "to obtain from another . . . money, property, or anything of value." Regarding this difference, the court said, "[T]he court of appeals said that . . . [the] definition [of scheme or artifice] did not mean that there was necessarily a specific intent to defraud that was required if you were under the second type of communications fraud. And so I'm not sure why we wouldn't just use that definition of scheme." The State replied, "The State's fine with that," and Counsel did not object.

¶16   The court then discussed "the mens rea instruction." This instruction stated, in part, that "[t]o find the defendant guilty, you must find with respect to each element of the offense that the defendant acted: a) intentionally; or, b) knowingly; or, c) recklessly." The court said, "The State's proposed instruction really had it just related to communications fraud, and there wasn't [another] one for the pattern of unlawful activity," so the court "just changed that language to the element of offense, so it applied [to] all seven charges." The State expressed its assent, and Counsel did not raise an objection.

¶17   The court and the State exchanged thoughts about the instruction on pattern of unlawful activity, and Counsel stated that he did not object to the instruction. The court then said, "Okay. Let's go to substantive things. Anything that looks [like] I've missed something or needs to be corrected?" Counsel did not then raise an objection.

¶18   The State mentioned that it was seeking an additional instruction regarding the timing of an order of suspension based on evidence that had been admitted related to that issue. The State reviewed the caselaw and rules of procedure that the proposed instruction was based on and said,

> There's . . . a case that resulted from [Johnson's] appeal in [the discipline] case, so it's kind of law of the case. It's [*Johnson v. Office of Professional Conduct*,

> 2017 UT 7, 391 P.3d 208]. And the ruling—the finding of that case by the Supreme Court is that the order from June 15 was the order of the court. It gave rise to the appeal because [it was] the final judgment.
>
> And so this issue, even though there's been testimony about it, is really a matter of law. And I think it's appropriate to have a jury instruction, so that the jury isn't back there wondering, like, how appellate case law works or how the appellate process works. It's a settled issue that I think could be addressed through a jury instruction.

The court asked Counsel to respond, and Counsel said, "I think the jury already has the multitude of court rulings and this would only serve to further confuse them. It's [c]umulative, and I would object to it." The court then stated, "I do think it's important for legal instruction because it is a legal issue as far as the effectiveness of an order. And so to inform the jury what the law is on that, I do think it's appropriate . . . ." However, the court stated, "I'm not sure that I'm going to necessarily agree with this language. . . . So I will look at this in the citations and come back with an instruction on that . . . ."

¶19   The court asked, "Any other discussion on instructions or verdict form?" Counsel did not respond with any objections. The State attempted to add an alleged victim to count two, but Counsel objected and the court did not make the change. The court then asked again, "Anything else on instructions or verdict form?" Counsel responded, "No, Your Honor."

¶20   After this, the court took a break to consider the language of the proposed instruction related to the timing of Johnson's suspension. It then said, "Okay. So we're back on record. I have looked at the law cited by the State in support of the instruction on judgments, and I think it's appropriate, and I am going to give

that instruction as written. I haven't revised it." Counsel then renewed his objection to that instruction.

¶21 The jury acquitted Johnson on one count of communications fraud (count two) but convicted him on the remaining counts. Johnson was later sentenced to concurrent prison terms. The court suspended the prison terms, ordered jail time, and placed Johnson on probation for thirty-six months. Some time after sentencing, the court held a restitution hearing. The minutes of the hearing indicate that the court ordered Johnson to pay $1,541,000 in restitution. Johnson has not provided a transcript of that hearing. Johnson appeals his convictions and the court's restitution order.

ISSUES AND STANDARDS OF REVIEW

¶22 Johnson asks us to set aside the jury's verdict and the restitution order for several reasons. First, he alleges that his convictions "were the result of a constructive amendment of the Information" based on the jury instructions. Johnson acknowledges that he did not raise an objection on this point at trial. Accordingly, the appropriate standard of review for this issue is plain error. Under the plain error standard of review, a defendant "must demonstrate that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Bond*, 2015 UT 88, ¶ 36, 361 P.3d 104 (cleaned up).

¶23 Second, Johnson argues that the district court erred in giving jury instructions that allowed the jury to convict based on a mens rea of recklessness. Johnson again recognizes that this issue was not preserved; he contends that "the lack of the requirement of a mens rea of a specific intent to defraud is so egregious that the convictions should be vacated because [of]

plain error and manifest injustice."[4] Again, plain error requires an obvious error and prejudice. *Id.*

¶24    Third, Johnson asserts that the jury instruction related to the timing of the order suspending him from the practice of law was erroneous. "Generally, whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Malaga*, 2006 UT App 103, ¶ 7, 132 P.3d 703 (cleaned up). However, when a defendant fails to preserve an assertion of erroneous jury instructions, we "address purported errors made in the jury instructions under the doctrines of plain error/manifest injustice, exceptional circumstances, or ineffective assistance of counsel." *See id.*

¶25    Fourth, Johnson claims that his convictions were not supported by substantial evidence. "In considering an insufficiency of the evidence claim, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Maestas*, 2012 UT 46, ¶ 302, 299 P.3d 892 (cleaned up). "Thus, we will reverse a jury verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant

---

4. Rule 19(e) of the Utah Rules of Criminal Procedure states, in part, "Unless a party objects to an instruction or the failure to give an instruction, the instruction may not be assigned as error except to avoid a manifest injustice." Our supreme court has said, "Our cases are not entirely clear as to the meaning to be given the term 'manifest injustice.'" *State v. Verde*, 770 P.2d 116, 120 (Utah 1989). It concluded that "in most circumstances, the term 'manifest injustice' is synonymous with the 'plain error' standard." *Id.* at 121–22. We have no reason to distinguish the terms here, so we apply them interchangeably.

committed the crime of which he or she was convicted." *Id.* (cleaned up).

¶26 Fifth, Johnson argues that the district court erred in its restitution order. "We will not disturb a district court's restitution determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Watson*, 2021 UT App 37, ¶ 12, 485 P.3d 946 (cleaned up).

## ANALYSIS

### I. Constructive Amendment of the Information

¶27 Johnson alleges that the jury instructions constructively amended the Information, thereby violating his constitutional rights "to be informed of the charges against him" and "to a fair trial."[5] We disagree.

¶28 Johnson points us to federal caselaw stating that "an unconstitutional constructive amendment of a grand jury's indictment occurs when the evidence presented at trial, together with the jury instructions, so alters the indictment as to charge a different offense from that found by the grand jury." *United States v. Farr*, 536 F.3d 1174, 1180 (10th Cir. 2008) (cleaned up). The United States Court of Appeals for the Tenth Circuit stated,

---

5. Although Johnson states in his opening brief that his "objection to the constructive amendment was not raised at trial" and that, therefore, the appropriate standard of review for this issue is plain error, he also argues that "constitutional violations are such a structural defect in the constitution of the trial mechanism that [they] def[y] harmless error analysis" such that "[t]here is no need for the prejudice analysis." Because we determine that there was no constructive amendment here, we do not address this argument.

> In assessing a claim of an impermissible constructive amendment, our ultimate inquiry is whether the crime for which the defendant was convicted at trial was charged in the indictment; to decide that question, we therefore compare the indictment with the district court proceedings to discern if those proceedings broadened the possible bases for conviction beyond those found in the operative charging document.

*Id.* While we note that Johnson was not indicted by a grand jury but rather charged through an Information prepared by the State, we readily determine that the jury instructions did not impermissibly "broaden[] the possible bases for conviction" or "so alter[]" the Information "as to charge a different offense" from those outlined therein. *See id.*

¶29 Johnson first argues that the Information was constructively amended when the jury instructions for the elements of the communications fraud counts left off the language "to defraud another." In the Information, each communications fraud count alleged that Johnson "devised a scheme or artifice to defraud another . . . or to obtain from another . . . money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions." In the jury instructions, the "to defraud another" language was omitted. Instead, the instructions required the jury to find that Johnson "devised a scheme or artifice to obtain from another . . . money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions."

¶30 Removing one possible ground from a charge does not broaden the charge but rather narrows it. *See id.* Where a statute provides two possible grounds for a charge, it is not impermissible for the State to submit to the jury that the defendant was guilty by virtue of violating only one of these. The statute for

communications fraud condemns "[a]ny person who has devised any scheme or artifice to defraud another *or* to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions." Utah Code § 76-10-1801(1) (emphasis added). Therefore, Johnson could not have been convicted for a crime different from the one charged when the jury convicted him under the instruction's language.

¶31 Johnson further alleges constructive amendment through added language as to recklessness in the jury instructions. For each count of communications fraud, the instructions required the jury to find that "the pretenses, representations, promises, or material omissions made or omitted by the defendant were made or omitted intentionally, knowingly, or with a reckless disregard for the truth." Johnson contends that this language was erroneously added because "[t]his mens rea of recklessness was never mentioned, alluded to, or inferred in the charging documents."

¶32 Johnson's argument here fails because this language comes from the relevant statute. Utah Code subsection 76-10-1801(7) states that "[a] person may not be convicted under this section unless the pretenses, representations, promises, or material omissions made or omitted were made or omitted intentionally, knowingly, or with a reckless disregard for the truth." While this language was not quoted in the Information, for each count of communications fraud, the Information stated that the actions of Johnson were "in violation of" Utah Code section 76-10-1801. The jury instructions did not amend the Information by adding language directly from the statute cited in the Information.

¶33 Johnson also asserts that the jury instruction for a pattern of unlawful activity was erroneously amended because it did not state that the charge "required a finding of three episodes of unlawful activity" as indicated by statute, *see id*. § 76-10-1602, and

did not specify that the unlawful acts here were three or more episodes of communications fraud.

¶34   This argument, too, fails. The jury instruction required the jury to find that Johnson engaged in "a pattern of unlawful activity." Another jury instruction defined this term as "at least three episodes of unlawful activity."[6] And the only conduct charged—other than the pattern of unlawful activity—was multiple counts of communications fraud. It is unreasonable to read the jury instructions as requiring the jury to find anything different from what the Information specified—three or more acts of communications fraud.

¶35   Finally, Johnson alleges that these various modifications constructively amended the Information by removing the requirement that the jury find a specific intent to defraud. However, our court has previously considered a defendant's argument "that the communications fraud statute requires specific intent to defraud" and concluded that such an "interpretation of the statute is not dictated by its plain language and that neither Utah nor federal caselaw settles the question." *State v. Squires*, 2019 UT App 113, ¶¶ 28–29, 446 P.3d 581. Therefore, Johnson cannot prove plain error on his claim of constructive amendment because any alleged error on this point would not "have been obvious" to the district court, *see State v. Bond*, 2015 UT 88, ¶ 36, 361 P.3d 104 (cleaned up), where the question is, at best, unsettled.

¶36   Johnson fails to prove that the jury instructions constructively amended the Information, and he fails to prove plain error in this respect.

---

6. Johnson also takes issue with the definition of "scheme" given in this instruction. But the Information provides no definition of "scheme," so the instruction could not have constructively amended the term's meaning.

## II. Jury Instructions on Mens Rea

¶37     Johnson next contends that the district court erred in instructing the jury that it could convict based on a mens rea of recklessness. However, Johnson's argument on this point fails under the doctrine of invited error.

¶38     Our supreme court has directed that "if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction, [appellate courts] will not review the instruction under the manifest injustice exception." *State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111. This policy "prevents a party from taking advantage of an error committed at trial when that party led the trial court into committing the error." *Id.* (cleaned up). "We adhere to this rule for two important reasons. First, it fortifies our long-established policy that the trial court should have the first opportunity to address the claim of error. Second, it discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal." *Id.* (cleaned up).

¶39     Here, Johnson invited any alleged error the district court made regarding the instructions related to recklessness.[7] First, Counsel affirmed that he had reviewed the draft instructions. Then, the court explained why it left the language "to defraud another" out of the elements instructions for communications fraud, and Counsel did not raise an objection. The court next explained the proposed mens rea instruction, and Counsel did not object. The court then discussed the instruction on pattern of unlawful activity, and Counsel affirmatively declared that he did not object to the instruction. At this point, the court said, "Okay. Let's go to substantive things. Anything that looks [like] I've

_____

7. Johnson has not asserted ineffective assistance of counsel on this or any other issue to which we apply the invited error doctrine.

missed something or needs to be corrected?" Counsel did not state an objection. And again, after discussing the instruction related to the suspension order, the court asked, "Any other discussion on instructions or verdict form?" Counsel did not respond with any objections. Finally, after the State attempted unsuccessfully to add an alleged victim to count two, the court repeated, "Anything else on instructions or verdict form?" Counsel responded, "No, Your Honor." Because Counsel, "by statement or act, affirmatively represented to the court that he . . . had no objection to the jury instruction, we will not review the instruction under the manifest injustice exception." *Id.*; *see also State v. Jimenez*, 2009 UT App 368, ¶ 17, 223 P.3d 461 ("In this case, defense counsel undeniably approved the instructions. Thus, [the defendant] is precluded from relief based upon manifest injustice."), *aff'd*, 2012 UT 41, 284 P.3d 640.[8]

### III. Jury Instruction Related to Timing of Suspension Order

¶40 Johnson next argues that "[t]he verdict should be set aside" because the jury instruction related to the timing of Johnson's suspension from practicing law "was erroneous and highly prejudicial against" Johnson. We disagree.

---

8. In his reply brief, Johnson argues—for the first time—that the exceptional circumstances doctrine should apply to this and other alleged errors. An appellant who saves an issue for the reply brief deprives "the appellee of the chance to respond. That leaves [the appellate] court without a central tenet of our justice system—adversariness. That is fatal." *Taylor v. University of Utah*, 2020 UT 21, ¶ 50, 466 P.3d 124 (cleaned up). Accordingly, Utah appellate courts "have consistently held that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered forfeited and will not be considered." *Id.* (cleaned up). For this reason, we do not address Johnson's belated introduction of the exceptional circumstances doctrine.

¶41    The jury instruction at issue reads, "A judgment of the district court, including an order imposing sanctions on a lawyer, is complete and is entered when it is signed by the judge and recorded in the docket. An appeal or motion seeking relief from the judgment does not stay the judgment, unless specifically ordered by the court." Presumably, the State sought such an instruction in response to Agent 3's statement, "So it appears that I was incorrect"—referencing his testimony that Johnson was suspended from the practice of law beginning July 15, 2015.

¶42    Johnson contends that this jury instruction misstates the law.[9] We disagree. First, Johnson asserts that "[i]t was a false statement of the law to say the suspension began June 15, 2015." But the instruction did not say—or even imply—that Johnson's suspension began on that date. It indicated that the court's order was complete and entered on June 15, and this is accurate. *See Hunter v. Sunrise Title Co.*, 2004 UT 1, ¶ 12, 84 P.3d 1163 (stating that a dismissal was "effective . . . the date the district court entered its order"); Utah R. App. P. 4(a) (indicating that the date the clock begins running for appeal from a final judgment is "the

---

9. The State asserts that, on this point, Johnson's "arguments are not preserved" because Counsel's objection to the proposed instruction was not that it stated the law incorrectly but that "the jury already ha[d] the multitude of court rulings and this would only serve to further confuse them. It [was] [c]umulative." But "if the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (cleaned up), *cert. denied*, 496 P.3d 718 (Utah 2021).

    Moreover, whether Johnson preserved this issue is ultimately immaterial. Johnson argues that if it was unpreserved, we should apply plain error review. Because we decide that the instruction was a correct statement of law, Johnson loses regardless of which standard of review we apply.

date of entry of the judgment or order appealed from"). The effective date of the order ruling on suspension is distinct from the effective date of Johnson's actual suspension where the order specified that Johnson's suspension was "effective as of 30 days from the date" the order was entered. The first part of this instruction did not misstate the law.

¶43 The second portion of the instruction is also correct. It reads, "An appeal or motion seeking relief from the judgment does not stay the judgment, unless specifically ordered by the court." Johnson asserts that "[w]hen a motion to stay an attorney disciplinary sanction is filed with the trial court[,] it should stay the sanction at least until the motion is decided. The sanction of suspension is not a final order with the motion pending." He relies on *In re Discipline of Johnson*, 2001 UT 110, 48 P.3d 881, for this position, providing our supreme court's reasoning that because the "private practice of law cannot easily be stopped and started again, unless there is a substantial threat of irreparable harm to the public, a disbarred lawyer should be entitled to a stay of judgment pending appeal to this court where the final authority for discipline rests." *Id.* ¶ 17. But this very case defeats Johnson's argument. There, the supreme court stated that it was enunciating "a standard *to guide the discretion* of the district court in determining *whether to stay a judgment* of sanction pending appeal of that judgment to this court." *Id.* (emphases added). If a court has discretion to do this, it must actually exercise its discretion to stay the judgment. In the absence of such an exercise of discretion, there is no stay. *Id.* The supreme court is unambiguous on this point, saying again that a district court "*may, in its discretion*, grant the stay." *Id.* (emphasis added). This case cannot support Johnson's argument that the "sanction of suspension is not a final order with the motion pending."

¶44 Johnson also points to rule 62 of the Utah Rules of Civil Procedure, but this reliance is similarly misplaced. That rule states that "[w]hen a party seeks an appeal from an interlocutory order,

or takes an appeal from a judgment, granting, dissolving, or denying an injunction, *the court in its discretion may* suspend, modify, restore, or grant an injunction during the pendency of appellate proceedings." Utah R. Civ. P. 62(c) (emphasis added). Again, this rule confirms that a stay is neither mandatory nor automatic and must be granted to have force.

## IV. Substantial Evidence

¶45    Johnson next argues that the guilty verdicts against him "are not supported by substantial evidence." We disagree. Johnson's argument on this point as to counts three through seven fails because Johnson invited any alleged error as to these counts. When Counsel moved for a directed verdict after the State finished presenting its case, Counsel said that as to all but the first count, he "would submit . . . that there's substantial evidence that the case should proceed to the jury." "Under the doctrine of invited error, [Utah appellate courts] have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (cleaned up). Accordingly, we do not entertain Johnson's argument regarding these counts.

¶46    As to the question of whether Johnson's conviction on count one is supported by substantial evidence, the State argues that this issue is unpreserved, and we agree. "In order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Salt Lake City v. Josephson*, 2019 UT 6, ¶ 12, 435 P.3d 255 (cleaned up). One factor we consider in determining whether a district court had an opportunity to rule on a certain issue is whether a party "specifically raised" the issue argued on appeal. *Id.* (cleaned up).

¶47    In seeking a directed verdict, Counsel argued that count one should be dismissed because there was "no nexus" between

Johnson and the alleged victim of count one where the relevant exhibits showed that the wiring instruction, though from Johnson, stated that the money would be sent directly to Lender and where the related promissory note and loan agreement did not involve Johnson. This argument falls far afield from the one Johnson makes on appeal. Johnson now provides several reasons he believes the evidence was insufficient: he "did not falsely promise to hold [borrowers'] money in his attorney trust account until the borrowers received their loans," he "did not falsely promise to refund [borrowers'] money if they did not get their loans," there was "insufficient evidence that [Johnson's] omission to tell borrowers his law license was suspended was a material omission," Johnson "did not misrepresent that he would not get any money from these victims until they received their loan," and he "did not falsely pretend that the victims would receive their loans in a short time period." None of these points bears any meaningful semblance to Johnson's contention to the district court that there was no nexus between him and the alleged victim referenced in count one. Accordingly, we cannot say that the issue presented was "sufficiently raised to a level of consciousness" before the district court such that it had an "opportunity to rule on that issue." *Id.* (cleaned up).

¶48 Furthermore, even if plain error review is available to Johnson here for this unpreserved issue, Johnson loses. He cannot succeed in any claim of insufficiency because he has omitted critical evidence from the record for appellate review, and this failure defeats—at least—the prejudice element of plain error. "When an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below," and "when crucial matters are not included in the record, the missing portions are presumed to support the action of the" jury. *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (cleaned up).

¶49 Johnson has failed to provide a transcript of the trial testimony for both himself and his wife, but he argues that these

omissions do not constitute "crucial matter that was left out of the record on appeal" because Johnson's testimony came in sufficiently through the testimonies of the FBI agents and the recorded interviews the State played for the court.[10] This cannot be true. We are hard pressed to think of a circumstance where, in a criminal trial, the omitted testimony is not material where it is the defendant's own testimony. Furthermore, there is a significant difference between the type of evidence missing from the record (testimonial evidence under oath and subject to cross-examination) and that included in the record (surreptitious recordings of extrajudicial interactions with Johnson).

¶50 Additionally, without being able to compare Johnson's trial testimony to the testimony that came in through the FBI agents and interviews, we cannot know how much alignment there was between these. It may well be that when Johnson took the witness stand, he provided more incriminating evidence than

---

10. In apparent anticipation of Johnson arguing that our sufficiency inquiry should be restricted to the evidence presented in the State's case-in-chief, the State asserts that Utah has adopted the "waiver rule," which the State explains thus: "When, as here, a defendant moves for a directed verdict at the close of the State's case-in-chief and then proceeds to his case after his motion is denied, he waives any limitation on the appellate court's review of the evidence before the jury." In support of this argument, the State cites *State v. Stockton*, 310 P.2d 398, 400 (Utah 1957); *State v. Hawkins*, 2016 UT App 9, ¶¶ 41, 43–44, 366 P.3d 884, *cert. denied*, 379 P.3d 1181 (Utah 2016); and *State v. McCallie*, 2016 UT App 4, ¶ 42 n.8, 369 P.3d 103, *cert. granted*, 384 P.3d 567 (Utah Sept. 12, 2016) (No. 20160500), *and cert. dismissed as improvidently granted*, June 7, 2017 (No. 20160500). We need not address this issue because Johnson does not actually argue that his and his wife's testimonies would not be permissible for appellate review on this issue but rather that his testimony was adequately presented to us through the transcripts he provided.

was previously relayed. *See State v. 633 East 640 North*, 942 P.2d 925, 929 (Utah 1997) (recognizing that a defendant who puts on evidence after the denial of a directed verdict motion "run[s] the risk of producing evidence tending to prove elements of the plaintiff's case that may not have been proven at the time the motion for directed verdict was made"). Indeed, here we can presume that such an occurrence happened because these "crucial matters are not included in the record," so "the missing portions are presumed to support the action of the" jury. *See Pritchett*, 2003 UT 24, ¶ 13 (cleaned up). Because Johnson has failed to provide us an adequate record, we cannot find prejudice here, and we cannot determine that his convictions are unsupported by substantial evidence.

## V. Restitution

¶51    Finally, Johnson argues that the district court "abused its discretion in awarding excessive restitution." But fatally for Johnson, he has also failed to provide us with a transcript of the restitution hearing, and without this, he fails to carry his burden on appeal.

¶52    Johnson makes several arguments against the court's restitution order; but because there is no transcript of the restitution hearing, "we presume the regularity of the proceedings" in the restitution hearing, and the missing transcript is "presumed to support the action" of the district court. *See State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (cleaned up). All we have available to us to review Johnson's claims are the spartan hearing minutes, from which we confirm that the State provided both evidence and argument to the court. Each of Johnson's arguments here fails because, assuming the regularity of the proceedings, the State could have presented evidence directly contradicting these arguments during the hearing. "[W]e must presume that" the evidence the State presented at trial "supports the district court's [order]; under these circumstances, we are

simply not in a position to second-guess the court's [order]." *Laker v. Caras*, 2023 UT App 125, ¶ 19; *see also State v. Case*, 2020 UT App 81, ¶ 20, 467 P.3d 893 ("[The appellant] has not provided a record of the hearing at which the court denied his motion, so we cannot analyze the correctness of the trial court's ruling . . . ."), *cert. denied*, 474 P.3d 948 (Utah 2020). Accordingly, we reject Johnson's argument that the court exceeded its discretion in reaching its restitution award.

## CONCLUSION

¶53　All of Johnson's arguments fail. First, Johnson is incorrect in asserting that the jury instructions constructively amended his charges. Second, Johnson invited any alleged error related to the jury instructions on mens rea. Third, the jury instruction related to the timing of the effectiveness of orders is correct. Fourth, Johnson's claim as to the sufficiency of the evidence is unavailing on counts three through seven for invited error and on count one because his failure to produce critical trial testimony defeats his assertion of prejudice. Fifth, Johnson fails to carry his burden to persuade us that the district court abused its discretion related to its restitution order because he has not provided us a transcript of the restitution hearing. Consequently, we affirm Johnson's convictions and the court's restitution order.

———————