**2026 UT App 53**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANDREW RAYMOND TAYLOR,
Appellant.

Opinion
No. 20230210-CA
Filed April 9, 2026

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 201100010

Ramon Ortiz, Debra M. Nelson, Benjamin Miller, and
Wendy M. Brown, Attorneys for Appellant

Derek E. Brown and Jeffrey G. Thomson,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Andrew Raymond Taylor appeals from his conviction of one count of violation of a protective order and four counts of domestic violence in the presence of a child. He argues that the trial court plainly erred by (1) allowing testimony that disclosed improper character evidence and (2) providing the jury with a special verdict form that improperly shifted the State's burden of proof to him. We conclude that Taylor has not met his burden to show harm resulting from either alleged error, and we therefore affirm his convictions.

BACKGROUND

¶2 Taylor was previously in a relationship with a woman (Mother) with whom he had three children. Mother later obtained a protective order against Taylor. The order generally prohibited Taylor from contacting Mother or her five children (three of whom were the children she shared with Taylor) in any way, and the order specifically prohibited Taylor from coming within "50 feet" of Mother, her home, her workplace, her place of worship, or her vehicle. The order did, however, allow Taylor parent-time with his children "provided [he] arrange[d] those visits through [Mother's] lawyer." The protective order was served on Taylor on November 13, 2019.

¶3 On November 16, 2019, Mother was traveling with four of her children (three of whom were the children she shared with Taylor) to a birthday celebration. Along the way, she stopped at a gas station to fuel up, and there she had an encounter with Taylor. According to Mother, she had just started the gas pump and was returning to wait inside the car when "[Taylor's] truck came just out of nowhere" and "came flying up beside" her on the other side of the pump. She said that Taylor's "door flung open as he was putting [the truck] in park" and that the truck "was almost basically still moving as he was trying to jump out." Mother saw Taylor "coming for [her] car at a fast pace," and she was fearful that Taylor "was going to attack" her. Mother said that Taylor "walked past" her, went to the passenger side of the car, and began "banging on the window and trying to open the door," which caused the children inside to begin "screaming" for Mother to call the police. Mother "grabbed [her] phone" from inside the car, "started recording," and yelled at Taylor "to get away from [her] car." Mother's recording captured video of Taylor as he was returning to his car, shifting it into gear, and pulling away. Mother then called 911 to report the incident and request police help. She was in tears at the time.

¶4      After Taylor left the gas station, he also called 911 about the incident. He explained to the 911 operator, "I went to see my kids 'cause they pulled up to the gas station and I walked over, told them I love them, and waved at them and walked away. My ex is probably calling you guys on the phone right now trying to have me arrested . . . ." He further explained that he was at the gas station first and had seen Mother pull up, that he had not seen his children in over eight months so he "walked over to the car," but that when Mother started threatening to kill him, he just told the children he loved them and then walked away. Taylor then repeatedly asked the 911 operator if he needed to come turn himself in, and he indicated that he was willing to do so if necessary.

¶5      As a result of the encounter, Taylor was charged with one count of violation of a protective order and four counts of domestic violence in the presence of a child (one count for each of Mother's children that witnessed the encounter).[1] At the ensuing trial, Taylor exercised his right to represent himself, although he also retained an attorney to function as standby counsel.

¶6      As part of the State's case, the jury heard Mother's testimony and the audio recordings of both 911 calls. The jury was also shown the brief video Mother had recorded with her phone.

¶7      Mother's testimony set forth her view of the encounter as recounted above. On cross-examination, Taylor questioned Mother, in part, as follows:

> [Taylor:] So all [the] kids were saying, "Call the cops, Mommy. Call the cops. Call the cops, Mommy"?

---

1. The term "domestic violence" is defined to include the violation of a protective order. *See* Utah Code § 77-36-1(4)(b)(xiii).

[Mother:] They've watched me be abused by you, so yeah.

[Taylor:] And what abuse did I ever do to you, please?

[Mother:] You put staples in the back of my head.

[Taylor:] Objection, Your Honor. She's lying.

[The court:] Overruled. You asked the question.

[Taylor:] Okay.

[Mother:] You punched me in the face while I was holding a child.

[Taylor:] Wow.

[Mother:] And you've hit me in the chest while I was pregnant.

[Taylor:] When were all these occurrences? Can you please name the dates and times, the issue which—I don't even know how to ask a question because these didn't happen. But could you please [tell] the date and times.

[Mother:] One of the times before I got a protective order, the time that I got staples in the back of my head you begged me not to tell on you, so I told them that a shelf fell on my head.

[Taylor:] I'm sorry, ma'am. Could you please repeat that? I begged you to do what?

[Mother:] Not to tell on you.

[Taylor:] Too bad we can't have a lie detector test in
here.

After this exchange, the trial court reminded Taylor that he was
not allowed to "make comments after the witness testifie[d]," and
Taylor moved on to another topic.

¶8    During redirect, the prosecutor asked Mother about her
reasons for seeking a protective order, and in her subsequent
string of answers, Mother alleged prior bad and abusive actions
by Taylor:

> I got it because . . . we were kind of going
> back and forth in our relationship, and I was trying
> to leave multiple times, and he kind of manipulated
> me to come back, told me everything was going to
> get better.
>
> At this time we went down to his sister's
> house in Layton. We were down there for maybe a
> couple weeks. And at that time he was having an
> affair with his current wife. And the night that I
> ended up having to call 911 to get out of his sister's
> house, his nephews told me that—or he was
> planning to take me, I guess, on a date to the movies.
> And his nephew told me not to get in the car. That
> he was going to be taking me up to the mountains
> and, and I wouldn't be coming back.
>
> So I locked myself in the bathroom, and I
> called 911, and I had them come get me out of the
> home. And at that point, that was the last time that
> I ever wanted to have contact with him. That scared
> me so bad. I feared for my life for—even to this day
> I still fear for my life.
>
> . . . .

. . . [Taylor's nephew told me that Taylor] was taking me into the mountains and I wouldn't be coming back. That [Taylor] was going to give him $3,000 to let him borrow his car and he'd make sure that there was no evidence left behind.

. . . .

. . . [Taylor] threatened me all the time. I have text messages of him telling me that he was going to take my life, that he had a shooting record, that maybe I don't know his shooting record, and [he] would name all the medals that he has gotten in his shooting competitions.

He—my mom was blind and he would text her phone and tell her that her daughter was going to die. And he would tell me that if I ever left he would kidnap me and have people gang rape me.

. . . .

When our first child that we had together was a baby, he, like, came up behind me, grabbed me, like, I was trying to put my shoes on at the stairs, we were kind of fighting. And I tried to put my shoes on at the stairs and he came up and he grabbed me, and I turned around and I had a shelf next to—it was kind of like a shelf next to the door and he grabbed it and threw it on top of me and it busted and went at the back of my head. And like almost hit our daughter. My daughter was sitting right there.

And then he punched me in the face at his dad's house when I was sitting in the front seat of my car trying to leave.

One time when I was at my mom's house, he came to my mom's house and I was holding the kids and I had two of the children in the car, in his vehicle. He was wanting to see the kids and he was accusing me of cheating on him and that I was seeing all these people and he hit me in the side of the face and then in the chest while I was pregnant and holding one of my children.

. . . .

There is something being investigated right now about . . . my oldest daughter that's not his, about sexual abuse that she has came out about.

. . . .

[There] was a time that he threw the shelf down on top of me, big, I guess, kind of like a shelf and the part—he literally ripped it like in half and the part that he grabbed like flew at me and hit me in the back of the head.

. . . .

I had to get staples in the back of [my] head.

¶9 Both Taylor and his current wife testified as defense witnesses. Taylor's wife related that she and Taylor had stopped at the gas station convenience store and they saw Mother as they were leaving. Taylor's wife said that when they were "basically at the exit," she heard "little girls" saying, "Daddy, Daddy, Daddy," and that the "[n]ext thing [she] kn[ew]," Taylor stopped the vehicle and jumped out. She testified that when the truck stopped, it was over sixty to seventy feet away from Mother's vehicle, but she also admitted that she "couldn't see whether or not [Taylor] approached [Mother]" because the gas pumps were blocking her

line of sight. However, she stated that by the time she "shuffl[ed] to get [herself] out of the seatbelt"—an action she estimated took her "[t]hirty seconds to a minute" due to some medical issues— Taylor was already "approaching the [truck]" again, and the two quickly left the gas station.

¶10　Taylor testified that he and his wife were "at the gas station first" and that when he saw Mother, he started to leave. But he said he stopped his truck near the exit because something was rubbing on his tires. He asserted that the video Mother recorded was zoomed in to make him appear closer than he was and just showed him—when he was parked "60 to 80 feet away" from Mother—going back to his truck after he "got out and looked underneath the front end."

¶11　At the end of trial, the jury was instructed as to the elements of the charged offenses and certain relevant definitions. The jury was instructed that domestic violence includes the violation of a protective order "by one cohabitant against another." And the jury was provided with the following definition of "cohabitant":

> [A]n individual who is 16 years old or older who:
>
> - is or was a spouse of the other party;
>
> - is or was living as if a spouse of the other party;
>
> - has or had one or more children in common with the other party;
>
> - resides or has resided in the same residence as the other party; or
>
> - is or was in a consensual sexual relationship with the other party.

Along with the verdict form, the jury was presented with a special verdict form that read as follows:

> We, the Jury, have found the defendant, [Taylor], guilty of VIOLATION OF A PROTECTIVE ORDER. We also unanimously find beyond a reasonable doubt that the State:
>
> _____ has
>
> _____ has not
>
> proven beyond a reasonable doubt that [Taylor] and [Mother] were cohabitants at the time of this offense.

¶12 The jury thereafter found Taylor guilty as charged, including indicating on the special verdict form that the State had proved cohabitation beyond a reasonable doubt. Taylor now appeals.

## ISSUES AND STANDARD OF REVIEW

¶13 Taylor argues that Mother was improperly allowed to provide testimony as to his character and that the jury was given a constitutionally deficient special verdict form. He recognizes that neither argument was preserved for appeal, so he raises each issue under the plain error exception to the preservation requirement. "Because a claim of plain error . . . involves no lower court ruling, we decide the claim in the first instance as a matter of law." *State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53, *cert. denied*, 568 P.3d 264 (Utah 2025).

ANALYSIS

¶14    Taylor makes two assertions of plain error, one based on Mother's testimony regarding his character and one based on the special verdict form. "Under the plain error standard of review, a defendant must demonstrate that (i) an error exists; (ii) the error should have been obvious to the [trial] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Johnson*, 2023 UT App 145, ¶ 22, 540 P.3d 744 (quotation simplified). "If any one of these requirements is not met, plain error is not established." *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (quotation simplified).

¶15    For each of Taylor's assertions, we rest our decision on his failure to meet the third requirement of a successful plain error claim; that is, we determine that even if the issues he raises were in fact errors that should have been obvious to the trial court, he has not shown that they were harmful. We address each asserted error in turn.

I. Mother's Testimony

¶16    Taylor argues that the trial court plainly erred by allowing Mother to testify to improper character evidence. This argument is based on Mother's various statements during the redirect examination by the prosecutor alleging Taylor had participated in a murder plot, infidelity, and various instances of physical and sexual abuse. He argues that these statements were inadmissible under rule 404(b) of the Utah Rules of Evidence, which provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, even assuming, without deciding, that it was obvious error for the trial court to fail to take some action in response to these statements, Taylor has not shown a reasonable likelihood of a more favorable outcome for him had the court done so.

¶17    First, the jury was initially exposed to most of the abuse allegations during Taylor's cross-examination of Mother. He had asked her, "[W]hat abuse did I ever do to you, please?" And in response, Mother told the jury about various occasions of physical abuse.

¶18    Second, because the State's case was incredibly strong, there is little likelihood of a different result here even had the trial court responded differently. *See State v. Benson*, 2014 UT App 92, ¶ 30, 325 P.3d 855 ("When assessing an error's harmfulness, we look, in part, to the overall strength of the State's case: the more evidence supporting the verdict, the less likely there was harmful error." (quotation simplified)). For the point at issue—whether Taylor violated the protective order by coming within fifty feet of Mother, her children, or her vehicle—the evidence presented to the jury was overwhelming.

¶19    Mother testified that Taylor quickly exited his truck and came toward her vehicle "at a fast pace" and tried to get to the children before retreating to his truck. This matches the information relayed in both 911 calls and the video Mother took on her phone. Indeed, Taylor himself admitted in his 911 call, "I went to see my kids 'cause they pulled up to the gas station and I walked over, told them I love them, and waved at them and walked away." And a second time in that call he acknowledged that he "walked over to the car." Additionally, when he told the 911 operator that he was willing to come turn himself in, he impliedly acknowledged he had violated the protective order.

¶20    As to the evidence presented by Taylor, it did little to rebut the evidence that he had approached Mother's vehicle. Indeed, Taylor's wife's testimony was consistent with such an inference. She testified that right after she heard "little girls" calling "Daddy, Daddy, Daddy," Taylor quickly stopped and exited the truck. And although she stated that she "couldn't see whether or not [Taylor] approached [Mother]" because the gas pumps were

blocking her line of sight, she did not testify that she saw Taylor doing anything else (like going toward the front of the truck, which would presumably have been in her line of sight). And the additional facts to which she testified—that Taylor's truck was *parked* over sixty to seventy feet away from Mother's vehicle or that he returned to his truck quite quickly—could also be consistent with Mother's version of events.

¶21 Considering all this, we are convinced there is no reasonable likelihood that had the trial court taken further action to address the character evidence testimony, the jury would have believed Taylor's uncorroborated assertion (inconsistent with even his own prior statements) that he exited his truck only to check under the vehicle and did not come within fifty feet of Mother, her children, or her vehicle. Thus, his assertion of plain error on this point fails.

## II. The Special Verdict Form

¶22 Taylor also argues that the trial court plainly erred by using a special verdict form that improperly "shifted a burden" from the State to him. Specifically, he argues that the special verdict form addressing cohabitant status was constitutionally deficient because its phrasing "suggest[ed] an element had to be disproved" and "impermissibly shifted the burden" to him to disprove the cohabitant status. And he generally asserts that this phrasing "was harmful because it lowered the prosecution's burden."

¶23 But again, we see no harm to Taylor, even assuming obvious error on the special verdict form. This is because the element addressed by the special verdict form—the cohabitant status of Taylor and Mother—was effectively undisputed. At trial, Mother testified that she "was in a relationship with [Taylor] for seven years and [they] ha[d] three children together." Taylor agreed to these facts in his testimony, acknowledging that he had been "in a relationship with" Mother and "had kids with" her.

And Taylor points us to nothing in the record that runs contrary to these assertions of fact.

¶24　The jury was correctly instructed that the term "cohabitant" included "an individual who is 16 years old or older who . . . is or *was* living as if a spouse of the other party; has or had one or more children in common with the other party; resides or *has resided* in the same residence as the other party; or is or *was* in a consensual sexual relationship with the other party." (Emphasis added.) *See* Utah Code § 78B-7-102(7)(a) (defining "cohabitant"). And the facts as asserted by both Mother and Taylor clearly satisfy that definition. Thus, even had the special verdict form been phrased differently to more accurately express the State's burden, there is no reasonable likelihood that the jury would have found that Taylor and Mother were not cohabitants. Because Taylor cannot show harm, this assertion of plain error also fails.[2]

## CONCLUSION

¶25　For each of his plain error arguments, Taylor has failed to show that the asserted error was harmful. Therefore, we affirm.

———————

2. Taylor alternatively argues that if the plain error doctrine does not apply, there is "no avenue available for review" here, which "should justify exceptional-circumstances review." *See generally State v. Centeno*, 2023 UT 22, ¶ 57, 537 P.3d 232 (explaining that the exceptional circumstances exception to the preservation rule "is applied sparingly," is "reserved for the most unusual circumstances," and requires "a showing of a rare procedural anomaly" (quotation simplified)). But because we address the claimed error in the special verdict form under the plain error doctrine, we do not reach Taylor's alternative argument.