**2024 UT App 174**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARTIN GARCIA-CARDIEL,
Appellant.

Opinion
No. 20220531-CA
Filed November 29, 2024

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 191902579

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and Emily Sopp,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1     Martin Garcia-Cardiel appeals his convictions on nineteen counts of aggravated sexual abuse of a child. First, he argues the trial court plainly erred and his trial counsel (Counsel) was ineffective for permitting an expert to testify about delayed reporting in child abuse cases. Second, he argues the trial court erred by overruling his objection to the detective's (Detective) testimony that she was not surprised that Garcia-Cardiel's family denied the abuse because they spoke with his lawyer and received legal advice. Finally, he filed a rule 23B motion seeking a remand to develop the record on his claim that Counsel was ineffective for not offering a competing translation of a jail phone call between Garcia-Cardiel and his family. For the reasons set forth below, we affirm Garcia-Cardiel's convictions and deny his remand request.

BACKGROUND[1]

¶2    Sisters Mia[2] and Lizzie's family moved in across the street from Garcia-Cardiel when Mia was eight and Lizzie was seven. The girls quickly became friends with E.G. and J.G., two of Garcia-Cardiel's five daughters, and spent most afternoons and evenings at their house while Mia and Lizzie's mom was at work or school. Mia and Lizzie saw Garcia-Cardiel at least "three to four times" a week when they were at his house. Not long after Mia and Lizzie moved in across the street, Garcia-Cardiel began sexually abusing them. Over the span of five years, he sexually abused them hundreds of times.

*The Abuse[3]*

¶3    **Mia.** Garcia-Cardiel's abuse of Mia began with him forcing her to sit on his lap while he was on the couch. "[A]t first, he would just sit [her] on his lap," but "over time he would grab [her] hips" and "swirl them over him," pulling her "closer to his body." "Many times," Mia felt Garcia-Cardiel's erect penis on her "butt"

---

1. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Rogers*, 2020 UT App 78, n.2, 467 P.3d 880 (cleaned up).

2. We employ pseudonyms for the victims and initials for other minors in this opinion. *Cf.* Utah R. App. P. 24(d) ("The identity of minors should be protected by use of descriptive terms, initials, or pseudonyms.").

3. Because the details of the abuse are not necessary to our determination of the legal issues raised on appeal, we include only an abbreviated version of the facts sufficient to provide context to the reader.

as he held her on his lap. "A lot of times" when Mia was forced to sit on his lap, Garcia-Cardiel "would stick his hand under [her] shirt, under [her] bra, and grab [her] breasts. Or he would stick his hand in [her] pants," both under and over her underwear, and insert "his fingers in [her] vagina."

¶4     One incident stood out to Mia because it made her cry. She was watching a movie with some of Garcia-Cardiel's daughters in a bedroom, and when the daughters left to get snacks, Garcia-Cardiel came in, closed the door, and laid himself down on the bed, pulling Mia on top of him. He tried to kiss her on the mouth, eventually grabbing her lip and pinching it to hold her still while he stuck his tongue in her mouth. He put his hand down her pants, felt her pubic hair, and made a remark about how she was "going to be so gorgeous." He then touched Mia's breasts and "scraped all the way down with his nail until his finger was in [her] vagina" despite Mia "telling him no" and crying.

¶5     At some point during the years in which the abuse was occurring, Mia talked about it with Lizzie, E.G., and J.G. One day Mia found Lizzie crying, and when she asked what was wrong, Lizzie told Mia that "something happened between her and [Garcia-Cardiel]" but did not provide any details. The next day, Mia and Lizzie talked with E.G. and J.G., who promised they would not leave Mia and Lizzie alone and would stay "all together." The plan did not work, however, and the abuse continued "two to three times a week." The abuse finally ended when Mia told her mother she did not need a babysitter and stopped going to Garcia-Cardiel's house.

¶6     **Lizzie.** "Every time" Lizzie saw Garcia-Cardiel when she walked into his house, he would force her to kiss him, "shove his tongue in [her] mouth," and "suck on [her] lips." Garcia-Cardiel usually sat on his living room couch, and whenever Lizzie walked by, "he would get up and grab [her]," forcing her to sit on his lap. One time when Lizzie sat on his lap, she felt his penis on her

"butt" as Garcia-Cardiel held her down by the waist and moved her in "circular motions." One of the first times he touched Lizzie's vagina occurred when he made her sit on his lap; he slid his hand down her pants and rubbed his hand "up and down" on her vagina. Garcia-Cardiel also touched Lizzie's breasts "a couple of times" by putting his hand up her shirt, and he touched her with his penis through clothing.

¶7     Garcia-Cardiel threatened Lizzie not to tell anybody about the abuse or she would "get in trouble." Once, Lizzie asked J.G. "why her dad did those things, and [J.G.] just told [Lizzie] to ignore it and to brush it off, to not worry about it." The abuse ended when Lizzie's family moved.

*The Reporting*

¶8     When Mia was nineteen, her father called and asked why she did not want to visit him in Mexico. Mia said she was "going through [her] own stuff right now" and "trying to process" "what happened when [she] was little." When her father asked what she was talking about, Mia told him she had been "raped" as a child. After Mia's dad called her mom to report his conversation with Mia, Mia told her mother that Garcia-Cardiel had abused her. When Mia's mother asked if Garcia-Cardiel had abused Lizzie, Mia said "something happened" but told her mother to ask Lizzie herself. Lizzie admitted to her mother that Garcia-Cardiel abused her and filed a police report that day "because [she] felt so bad that [she] didn't say anything before." Lizzie and Mia were each interviewed at the Children's Justice Center (CJC) by Detective.

¶9     With the help of a Spanish interpreter, Detective also interviewed Garcia-Cardiel, who denied sexually abusing the girls. He admitted "kissing the girls" on the mouth but claimed he treated them "like his own daughters." When asked whether he had ever lain on top of Mia, he replied, "[W]ell, yeah." Garcia-

Cardiel was arrested and charged with twenty-three counts of aggravated sexual abuse of a child.[4]

*The Trial*

¶10  At the four-day jury trial, Mia and Lizzie testified about the abuse. The State also called an expert in forensic interviews (State Expert), who described how children "may not remember every single incident" of abuse, especially if there have been hundreds of them, but that "there may be particular incidents that stand out to them, ones that they remember very well." State Expert also testified that there is "some research that suggests that 60 to 80 percent of all abuse is . . . not reported until adulthood." State Expert gave a list of factors for delayed reporting, such as not wanting to "disrupt the family system," trepidation about what will happen to the victims if they have been threatened not to disclose the abuse, financial concerns if the perpetrator is "the primary breadwinner" in the family, and fear that no one will believe them. State Expert did not offer specific testimony about Mia's or Lizzie's interviews; the only mention he made of Mia and Lizzie specifically was to state that he had reviewed their interviews and had "no major concerns" about how the interviews were conducted.

¶11  Detective testified about her interviews with Mia, Lizzie, and Garcia-Cardiel. Detective then explained how she reached out to Garcia-Cardiel's five daughters to interview them. They agreed only after they consulted with their attorney, who happened to also be their father's attorney. All the daughters denied seeing abuse happen to Mia or Lizzie. They also denied being inappropriately touched by their father. The prosecutor questioned Detective about the denials,

---

4. Four of the charges were later dropped by the parties' stipulation.

[The prosecutor]: Did that surprise you?

[Detective]: No.

[The prosecutor]: Why not?

[Detective]: Because in—just in my experience, I thought that the girls would protect their dad, you know. And they'd already spoken to an attorney—their dad's attorney, so they had been given legal advice and . . .

[Counsel]: Objection, she can't speak to that.

[The court]: The objection as to what exactly?

[Counsel]: She's—she's saying that they've already gotten legal advice, she can't testify to what—that kind of conversation she had with any of the attorneys. So I don't think she can testify to that.

[The court]: Did she testify to what the conversation with an attorney was?

[The prosecutor]: She said that the–

[Counsel]: She testified that the girls got legal advice.

[The court]: Okay. All right. So objection overruled.

Detective also testified she obtained recorded phone calls from the jail between Garcia-Cardiel and his family. Because the conversations were in Spanish, Detective had them translated into English. The translated transcript of one call—admitted into evidence—included an excerpt in which Garcia-Cardiel reassured his family that the allegations were unfounded, saying, "You know that I wouldn't do that. Everything else can be true but not

that . . . . [S]ometimes just playing around can really cost you." Garcia-Cardiel went on to say, "Yeah that's what happens . . . one just tries to be friendly and then sometimes your hand goes too far and you think that they won't have a problem and they won't be bothered and then they go and add more on top."

¶12    In his defense, Garcia-Cardiel called an expert (Defense Expert) in clinical and forensic psychology to testify. He opined that the CJC is "the best forensic interviewing facility in the United States." But he also explained that there are factors that can create problems for children reporting abuse, such as memory decay, suggestibility, and trauma. Defense Expert testified that time tends to adversely affect the ability "to recall and retain accurate memories." In his opinion, Mia and Lizzie believed they were telling the truth about the abuse but "familial influences were in play" that could affect the accuracy of their disclosures.

¶13    Garcia-Cardiel also called his wife and each of his daughters to testify. They denied seeing or experiencing sexual abuse in their house.

¶14    After deliberation, the jury found Garcia-Cardiel guilty on all nineteen counts of aggravated sexual abuse of a child. The court later sentenced Garcia-Cardiel to fifteen years to life in prison for each count, with the sentences on seventeen of the counts to run concurrently and the sentences on two of the counts to run consecutively.

ISSUES AND STANDARDS OF REVIEW

¶15    Garcia-Cardiel raises three issues on appeal. First, he challenges the admissibility of State Expert's testimony about delayed reporting in child abuse cases. Because he "did not preserve his objection to this error, we may review it only if it falls under one of the exceptions to the preservation rule." *State v. McNeil*, 2016 UT 3, ¶ 24, 365 P.3d 699. Garcia-Cardiel invokes the

ineffective assistance of counsel and plain error exceptions. "Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195.

¶16    Second, Garcia-Cardiel argues the trial court abused its discretion when it overruled Counsel's objection to Detective's testimony. Because the theories he presents on appeal were not specifically raised before the trial court and Garcia-Cardiel invokes no exception to preservation, we decline to address them. *See State v. Centeno*, 2023 UT 22, ¶ 57, 537 P.3d 232 ("It is well established that we will not address the merits of an unpreserved issue absent a showing that an exception to the preservation rule applies.").

¶17    Finally, in addition to the issues raised on direct appeal, Garcia-Cardiel filed a motion under rule 23B of the Utah Rules of Appellate Procedure seeking to remand the case to the trial court for supplementation of the record with evidence to support his claim that Counsel was ineffective for not presenting a competing translation of his jail phone call. Rule 23B permits us to remand a criminal case "to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). We will grant a rule 23B motion "only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.*

## ANALYSIS

### I. State Expert's Testimony

¶18    Garcia-Cardiel claims State Expert gave impermissible "anecdotal statistical evidence" about delayed reporting "to bolster the credibility of the late-reported accusations." Garcia-Cardiel acknowledges this argument was not preserved and asks

us to review it under both the plain error and the ineffective assistance of counsel exceptions to our preservation requirement.

A.      Plain Error

¶19    First, Garcia-Cardiel argues it was plain error for the trial court not to exclude State Expert's "anecdotal statistical evidence." "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. Failure to meet any of these requirements is fatal to a claim of plain error." *State v. Winter*, 2024 UT App 98, ¶ 17, 554 P.3d 355 (cleaned up), *cert. denied*, Oct. 10, 2024 (No. 20240977).

¶20    Garcia-Cardiel claims that State Expert's statement about "some research that suggests that 60 to 80 percent of all abuse is not [reported] at all or . . . not reported until adulthood" resembles the inadmissible probability evidence in *State v. Rammel*, 721 P.2d 498 (Utah 1986), and *State v. Iorg*, 801 P.2d 938 (Utah Ct. App. 1990). Thus, he argues, it was plain error for the trial court not to exclude it. We disagree.

¶21    In *Rammel*, the defendant's alleged accomplice initially denied involvement in an aggravated robbery but later admitted to driving the getaway car. 721 P.2d at 499. At trial, a detective testified he did not think it was unusual for the accomplice to have lied during his first interrogation because "most suspects lie when initially questioned by police." *Id.* at 500. Our supreme court concluded this was inadmissible testimony because it was more prejudicial than probative, and the court held that "probabilities cannot conclusively establish that a single event did or did not occur and are particularly inappropriate when used to establish facts . . . such as whether a particular individual is telling the truth at any given time." *Id.* at 501 (cleaned up). In *Iorg*, the defendant was accused of child sexual abuse. 801 P.2d at 939. At trial, an officer testified that "at least fifty percent" of the thirty abuse victims she had worked with waited more than a year to report

the abuse. *Id.* The detective then opined that delayed reporting was not an "indication of [the charge] being fabricated or being untrue." *Id.* at 939–40 (cleaned up). The detective also shared that she thought it "not unusual" for the specific victim in the case to have waited to report. *Id*. at 939. We concluded the officer's testimony "had the same potential for prejudice as the testimony condemned in *Rammel*" because the "anecdotal statistical evidence" weighed in on the victim's truthfulness. *Id.* at 941 (cleaned up).

¶22   Here, however, State Expert's testimony about delayed reporting was neither anecdotal nor used to bolster Mia's or Lizzie's truthfulness. Instead, State Expert's "60 to 80 percent" figure came not from his experience interviewing victims but from research he was familiar with as an expert in the field. And State Expert never testified specifically about Mia's or Lizzie's disclosures; he spoke only in general terms about delayed reporting of child abuse. Moreover, State Expert's testimony was not more prejudicial than probative because he was not asked, like the witnesses in *Rammel* or *Iorg*, to weigh in on another witness's credibility. Thus, State Expert's testimony was admissible under Utah law, and there was no error when the trial court did not exclude it. Accordingly, Garcia-Cardiel's plain error claim fails.

B.     Ineffective Assistance

¶23   Next, Garcia-Cardiel asserts that Counsel provided ineffective assistance by failing to object to State Expert's statistical evidence. To establish ineffective assistance of counsel, a defendant must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficient performance inquiry "should focus on whether counsel's assistance was reasonable considering all the circumstances." *State v. Gallegos*, 2020 UT 19, ¶ 34, 463 P.3d 641

(cleaned up). In doing so, "we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (cleaned up). "In short, the question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *Id.* ¶ 36 (cleaned up).

¶24 The strategy at issue here was Counsel's decision not to object to State Expert's testimony about delayed reporting. Because the testimony was permissible, as discussed above, reasonable counsel could have decided not to raise what would most likely have been a futile objection, and "where counsel could have reasonably believed that an objection was futile, counsel has not performed deficiently." *State v. Soto*, 2022 UT App 107, ¶ 31, 518 P.3d 157 (cleaned up), *cert. denied*, 526 P.3d 827 (Utah 2022); *see also State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). And even if we assume the objection would not have been overruled, "just because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance." *State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604. "Legal objections are an inherently strategic business." *Id.* Here, had Counsel objected to State Expert's testimony, it would have most likely been overruled, *see supra* ¶¶ 20-22, making it futile and drawing the jury's unwanted attention to why it was not a successful objection. Thus, we cannot fault Counsel for choosing not to object to State Expert's testimony, and we therefore conclude Garcia-Cardiel has not proved deficient performance.

## II. Detective's Testimony

¶25 Garcia-Cardiel contends the trial court abused its discretion when it overruled his objection to Detective's statement

that she was not surprised Garcia-Cardiel's daughters denied being abused after receiving legal advice from his attorney. Specifically, Garcia-Cardiel argues Detective's testimony was problematic in three ways: (1) it was "speculative" and violated rule 602 of the Utah Rules of Evidence because it went beyond "personal knowledge" of the daughters' conversations, (2) it disparaged opposing counsel, and (3) it amounted to a "kind of quasi-expert opinion." The State contends Garcia-Cardiel has not preserved these theories. We agree.[5]

¶26 Under the doctrine of preservation, "any issue brought on appeal must be sufficiently raised to a level of consciousness before the trial court such that the court has an opportunity to rule on it." *State v. Centeno*, 2023 UT 22, ¶ 54, 537 P.3d 232 (cleaned up). "This requirement promotes judicial economy and fairness." *Id.* Indeed, it would be unfair for us as "an appellate court to rule on an issue that is being presented for the first time on appeal," and it would run counter to the fact "that we are a court of review, not of first view." *Richmond v. Bateman*, 2024 UT App 103, ¶ 31, 554 P.3d 341 (cleaned up).

¶27 Our supreme court recently discussed the preservation rule in a similar situation in which the defendant objected during trial "on grounds of undue emphasis" but then claimed that "his objection was broad enough to preserve the confrontation and prejudice theories he . . . present[ed] on appeal." *Centeno*, 2023 UT 22, ¶¶ 53–55 (cleaned up). The court disagreed and held that "for purposes of preservation, we view issues narrowly and require a party to raise an issue before the district court *with specificity*." *Id.* ¶ 55 (emphasis added) (cleaned up). Thus, "where a party makes an objection at trial based on one ground, that objection does not

---

5. Garcia-Cardiel does not argue that we should reach this argument under any exception to the preservation requirement, and we do not do so.

preserve for appeal any alternative grounds for objection." *Id.* (cleaned up).

¶28   Likewise, the ground for Garcia-Cardiel's objection below does not track with the theories he now presents on appeal. Detective testified she was not surprised Garcia-Cardiel's daughters denied being abused because "in [her] experience, [she] thought that the girls would protect their dad," especially since they had "already spoken to an attorney—their dad's attorney, so they had been given legal advice." Garcia-Cardiel objected that "she can't speak to that." The court asked Counsel to explain the "objection," and Counsel replied, "[S]he's saying that they've already gotten legal advice, she can't testify to what–that kind of conversation she had with any of the attorneys. So I don't think she can testify to that." The trial court overruled the objection, noting that Detective did not "testify to what the conversation with the attorney was."

¶29   Garcia-Cardiel's vague objection gave no indication to the trial court that he viewed the testimony as "speculative" and lacking personal knowledge, nor did he alert the court that he deemed it as disparaging opposing counsel or being an impermissible "quasi-expert opinion." Garcia-Cardiel's objection thus "was insufficient to preserve [any] of the [theories] he now attempts to argue." *State v. Patrick*, 2009 UT App 226, ¶ 28, 217 P.3d 1150. Accordingly, "we decline to address [Garcia-Cardiel's] arguments because they are unpreserved." *Id.*[6]

---

6. Garcia-Cardiel also raises a cumulative error challenge on appeal. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Centeno*, 2023 UT 22, ¶ 85 n.10, 537 P.3d 232 (cleaned up). "Because we conclude that there are no errors to accumulate here, the cumulative error

(continued…)

### III. Rule 23B Remand

¶30    Garcia-Cardiel also requests this court to remand the case to supplement the record on an ineffective assistance claim. Specifically, he contends Counsel was ineffective when he failed to challenge the State's translation of the jail call. We deny Garcia-Cardiel's motion because he fails to establish deficient performance.

¶31    "Rule 23B of the Utah Rules of Appellate Procedure provides a mechanism for criminal defendants to supplement the record with facts that are necessary for a finding of ineffective assistance of counsel where the inadequacy of the record on appeal is a result of the ineffective assistance alleged." *State v. Miller*, 2023 UT App 85, ¶ 52, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023). We will grant a rule 23B motion, however, only if it contains "a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a). "If the motion cannot meet the test for ineffective assistance of counsel, then there is no reason to remand the case." *State v. Samples*, 2022 UT App 125, ¶ 57, 521 P.3d 526 (cleaned up), *cert. denied*, 525 P.3d 1279 (Utah 2023).

¶32    "Under *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *State v. Florreich*, 2024 UT App 9, ¶ 69, 543 P.3d 795 (cleaned up), *cert. denied*, 547 P.3d 828 (Utah 2024). Here, Garcia-Cardiel attached affidavits to his rule 23B motion, offering an affidavit from his appellate counsel and two affidavits containing alternative interpretations of the jail call, to support his contention

---

doctrine is inapplicable in this case." *State v. Modes*, 2020 UT App 136, ¶ 12 n.5, 475 P.3d 153 (cleaned up).

that Counsel's failure to offer a competing translation of Garcia-Cardiel's statements in the jail call was deficient performance.

¶33 But Garcia-Cardiel's proffer shows Counsel reasonably investigated the State's offered translation. In her affidavit, appellate counsel described how she asked Counsel "what he remembered about how the exhibit with the jail call was translated." Counsel responded that he "reviewed it with [their] interpreter and changes were made." Because "*Strickland* requires a reasonable investigation, not a limitless one," *id.* ¶ 71, we are not persuaded that Counsel was required to do more investigation than he already did, particularly when Garcia-Cardiel "points to no authority establishing that an attorney who found and then consulted with one or more experts in support of a possible strategy had an obligation under the Sixth Amendment to do more," *id.* Consulting with his interpreter and making changes suggested by the interpreter amounts to reasonable investigation.

¶34 Furthermore, Garcia-Cardiel's proffer also shows there is more than one correct way to translate the jail call. At trial, the State presented the following translation:

> Yeah, that's what happens . . . one just tries to be friendly and then sometimes your hand goes too far and you think that they won't have a problem and they won't be bothered and then they go and add more on top.

The affidavits attached to the rule 23B motion contained two alternate translations of Garcia-Cardiel's statement in the jail call:

- "That, I mean . . . that. Sometimes you want to be kind and you want to . . . you go, you go overboard and thinking that, that they, that there won't be a problem, and then, they exaggerate."

- "That's it, that's it . . . sometimes one tries to be friendly and you want . . . you lend someone a hand . . . and they thought that . . . that they . . . that there wasn't going to be a problem . . . that they aren't going to bother you, and then they include more."

¶35    As these variations demonstrate, translation is not an exact science. While Counsel could have sought out numerous experts until he found the most favorable translation possible, the Sixth Amendment "does not guarantee perfect representation," *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (cleaned up), and Counsel's decision not to provide a competing translation after he consulted with his interpreter and made changes to the State's translation "falls within the wide range of reasonable professional assistance," *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Thus, Counsel did not perform deficiently, and we therefore deny Garcia-Cardiel's rule 23B motion.

CONCLUSION

¶36    We reject Garcia-Cardiel's claims that the trial court plainly erred or Counsel was ineffective in dealing with State Expert's testimony about delayed reporting. We conclude that Garcia-Cardiel's ineffective assistance claim in regard to Detective's testimony was unpreserved. Finally, we deny Garcia-Cardiel's request for a rule 23B remand because his motion and proffer do not "support a determination that counsel was ineffective." Utah R. App. P. 23B(a). Accordingly, we affirm Garcia-Cardiel's convictions.

———————